# In the United States District Court

# for the Northern District of Georgia

# Atlanta, Georgia

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JAN 1 2 2022

KEVIN P. WEIMER Clerk
By: _____ Clerk

---

**Robert W. Smith**

Plaintiff *pro se,*

v.

**Robin Carnahan, Administrator,**

**General Services Administration (GSA)**

Defendant

**1 : 2 2 - C V - 0 1 4 6**

---

CIVIL ACTION (P0610) FILE NO.

---

*(to be assigned by Clerk)*

---

Filed: January 11, 2022

Before Honorable Timothy C. Batten, Sr., Chief Judge

1

# Contents

Claims…………………………………………………………………… 3

Jurisdiction ……………………………………..………………………….9

Parties..………………………………………………………………..….9

Plaintiff ………………………………………...……………………….....9

Defendants …………………………………………………………… 10

Defendant( s) under oath….…………..…………………………………12

Defendant( s) not deposed………..…………………………………..….13

Administrative Procedures………………………………………….…..16

Administrative Procedures After Removal…………………………………19

Nature of the Case………………………………...………………………21

Discrimination………………………………………………………….23

Plaintiff's Disability [ROI]………………………………………..………24

Interference with Major Life Activities………………………………….... 25

Plaintiff's Prior Protected Activities …………………………………………25

Essential Facts of Plaintiff's Claim(s)…………………………………….27

Adverse Action subject to 5 U.S.C. § 1215(a)(1)(A)………………………………. 32

Penalties………………………………………………………………... 44

Judge or Jury ……………………………………………………………51

Request for Relief………………………………………………………….51

Exculpatory Evidence…………………………………………………… 56

Monetary Relief………………………………………………………… 60

Signature    …………………………………………………………….71

## **Appendices**

Exonerating Testimony

A partial testimony of Mike Goodwin, Regional Commissioner

B partial testimony of Irena Metijevic, HR representative

C partial testimony of Julia Pfohl, Deciding Official and Factfinder

## *PRO SE* EMPLOYMENT  DISCRIMINATION  COMPLAINT  FORM

### **Claims and Jurisdiction**

1) The Plaintiff bring this Civil Action (P0610) action against the General Services
   Administration (GSA) for violation(s);

   a) of the American Taxpayer **trust** inherent in the Federal Property and
      Administrative Services Act of 1949, as amended by Congress. Congress
      enacted this legislation to provide for the federal government an economic
      and efficient system for the procurement and operation of buildings,
      procurement and distribution of general supplies, acquisition and
      management of a motor vehicle fleet, management of automated data
      processing resources, and management of telecommunications programs.

3

Even today, the GSA Website touts, "Delivering effective and efficient government services for the American people (https://www.gsa.gov/) whereas 12 years of GSA published and audited annual Financial Statements conflict with the 1949 enacted legislation and the GSA website advertisement knowing "If the Congress supported the removal of a GSA Administrator, PBS Commissioner, and 3 Regional Commissioners in 2012 over an $850,000 expenditure in Las Vegas, the Agency knows what would happen if the same Congress in 2012 knew that Region 4 alone was reporting $19 million in uncollected rent or overpayment rent in 2012[i.e. OIG 2012[1] stated, "billing errors" and billing losses"] and due the Agency inaction and retaliation on the Plaintiff the same $19 million grew to over $1.48 billion in loss lease capital in 2021- and growing $100 million each year the Plaintiff is absence of GSA.

b) On December 13, 2021 GSA Administrator Robin Carnahan statement on President Biden's Executive Order on Improving Customer Experience and Government Services for the American People-- will take priority over the mission of GSA and the execution of the Federal Property and Administrative Services Act of 1949, as amended by Congress. Congress enacted this legislation to provide for the federal government "Delivering effective and efficient government services for the 20,086 federal agencies

---

[1] https://www.gsaig.gov/sites/default/files/audit-reports/A120023_1.pdf

(https://www.gsa.gov/). Whereas this Statement made by Robin Carnahan or even as demonstrated earlier by other Administrators further enshrines GSA management action or inactions that created a $1.48 billion loss to the Federal Building Fund creating a $4.8 billion unsustainable repair and alteration demand on all 1500 federally-owned assets located throughout the nation creating a substantial fiscal risk on the GSA's ability to accomplish its mission. What's wrong in stating the truth to the President, U.S. Congress, Medias, American Taxpayer, and 20,086 federal client agencies ? GSA needs "NO NEW FUNDING" [appropriations] from Congress until it improves on the efficiencies in managing the $9-10 billion in operating funds the GSA already receives from 20,086 client-agencies. The Agency knows the Office of Inspector Generals Nicholas V. Painter (2012), Robert C. Erickson (2014) and Carol F. Ochoa, (2015) recommended improving on GSA planning and fulfilling the mandate of Office of Management & Budget (OMB) when communicating funding needs to Congress alone can save $1.48 in billion losses (OIG 2012) and $418 million in improvement opportunities and $485 million a year in overhead reduction at the GS-14, GS-15, and SES level (OIG, 2014, 2015), in all, will reduce the current level $4.8 billion building deficiencies into a potential development 24 new Federal Courthouse [vital infrastructure] or similar capital projects @$200

5

million each across this nation with a sustainable operating and reinvestment program for "Delivering effective and efficient government services for the 20,086 federal agencies in 9,486 federal assets.

c) Further, the Plaintiff issues this civil action against the General Services Administration(GSA) for it's 12 years of violation(s) and prohibition(s) against a qualified disabled associate's work and advise to resolve substantial fiscal risk as outline in (a) and (b) and change the trajectory of GSA's ability to accomplish its mission, follows;

   i) Civil Service Reform Act of 1978 (CSRA) identified prohibited practices in the federal workforce and discrimination on the basis of Disability under this statute.

   ii) Americans with Disabilities Act of 1990 (ADA), Congress intended that the Act "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities

   iii) Rehabilitation Act of 1973, makes it unlawful for a federal employer discriminate in compensation or in terms, conditions, or privileges of employment on the basis of disability.

   iv) "Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002,"which is now known as the No FEAR Act-- purpose of the Act is to "require that Federal agencies be accountable for violations of

6

antidiscrimination and whistleblower protection laws." Public Law 107-174

v) Whistleblower Protection Enhancement Act of 2012 (WPEA) was signed into law by President Obama on November 27, 2012. The law strengthen and improve protection for the rights of federal employees reasonably believed to evidence gross mismanagement, gross waste of funds, abuse of authority to prevent reprisals and to help eliminate wrongdoing within the Government and provides that the implementation and enforcement of nondisclosure agreements shall be consistent with the existing statutory framework for whistleblower protections;

(1) An agency official shall not discriminate against the Plaintiff for being a C6 Quadriplegic [disability or handicapping condition] as an applicant for more than 7 GS-15 positions 5 U.S.C. § 2302(b)(1).

(2) An agency official shall not intentionally deceive or obstruct Plaintiff from competing for employment. 5 U.S.C. § 2302(b)(4).

(3) An agency official shall not influence Plaintiff to withdraw from competition in order to improve the employment prospects of John Dennis (2008), Victoria Corkren (2008), Gwen Gladman (2012), Julia Pfohl (2015), Roman Augustus (2015) and Jamal Overton (2016) 5 U.S.C. § 2302(b)(5).

7

(4) An agency official shall not give John Dennis (2008), Victoria

Corkren (2008), Gwen Gladman (2012), Julia Pfohl (2015), Roman

Augustus (2015) Jamal Overton (2016) an unauthorized advantage in

order to injure the employment prospects of the Plaintiff 5 U.S.C. §

2302(b)(6).

(5) An agency official shall not retaliate against the Plaintiff for

whistleblowing Region 4 loses was $19 million. Failure to fully implement

the OIG (2012) recommendations has increased to over $130 million (R4) in

loss capital to the Federal Building Fund and over $ 1.45 Billion nation-wide. 5

U.S.C. § 2302(b)(8).

(6) An agency official shall not retaliate because the Plaintiff filed 7 GSA

Grievances, and 2 EEOC Report of Investigation (ROI), and disclosed to Office

of Special Counsel, Tracy Biggs (2014) and work with OIG Nicholas V. Painter

(2012); or, refused to obey an order that would require the employee to

violate a law. 5 U.S.C. § 2302(b)(9).

(7) An agency official shall not discriminate due to conduct that does not

adversely affect job performance.5 U.S.C. § 2302(b)(10).

(8) An agency official shall not take or fail to take a personnel action if

doing so would violate a law, rule or regulation implementing or

directly concerning the merit system principles. 5 U.S.C. §

8

2302(b)(12).

(9) An agency official shall not implement or enforce a non-disclosure policy, form or agreement if it does not contain a specific statement notifying employees of their rights, obligations, or liabilities relating to classified information, communications to Congress, whistleblowing to an Inspector General, or any other whistleblower protection. 5 U.S.C. § 2302(b)(13).

## Jurisdiction

The Plaintiff bring this civil action against the General Services Administration to the U.S. District Court for the Northern District of Georgia, Atlanta, Georgia has subject matter jurisdiction over violation of the above listed statutes and under 28 U.S.C. §§ 1331 and 1343.

## Parties:

1. **Plaintiff;** Robert W. Plaintiff, 151 Loumae Road Griffin, Georgia 30224, Email robertw.Plaintiff@att.net, Telephone:(770) 584-5850

Whereas, the Plaintiff [Chronic Spinal Cord Injury—C6 level or Quadriplegic] in April of 1989 was hired by GSA getting his GS-7 position benefiting from the Federal Government specific focus on hiring people with "targeted disabilities" an affirmative employment obligations stemming from the Rehabilitation Act of 1973,

9

as amended, call on the Federal Government to focus on the outreach, recruitment, retention, and advancement of people with disabilities at all grade levels..

## 2. Defendant( s).

The unlawful activities enumerated in this case were deliberately imposed upon the Plaintiff even though each respective GSA Official knew their activity contradicted their understanding of prevailing laws and even passing the annual federally mandated classes, as follows;

> 1) NO FEAR Act Training - course covers the rights and remedies available to Federal employees under both anti-discrimination laws and whistleblower protection laws. (5 CFR 724.203)
>
> 2) Equal Employment Opportunity Training -Training is mandatory for all GSA Employees (29 CFR 1614-102a (5))
>
> 3) Whistleblower Protection Training for Managers and Supervisors- Training is mandatory ((Whistleblower Protection Act of 1989/Whistleblower Protection Act of 2012).
>
> 4) Federally mandated training on; Hiring, Retaining and including People with Disabilities. The Federal Government is committed to having a world-class workforce that draws talented, knowledge, skills, and abilities of all Americans, including those with disabilities.

The following are the representative list of those critical General Services Administration (GSA) officials (Defendant( s)), in part and as a whole, who had the opportunity in each of their respective capacity to serve the interest of GSA , U.S. Congress and the American Taxpayer by assuring that the Plaintiff  or other federal employees with or without "protective status" did not suffer from unlawful retaliation, harassment and intentional discrimination—placing the Plaintiff in inadequate reasonable accommodation 1999 to 2011 and remove all of the Plaintiff's 26 years of accumulated reasonable accommodation in 2012 [valued at $50,000 to $70,000 (labor &material)] with no plans or request for funds to provide comparable replacement for a handicap accessible office, especially design floor urinal that was removed, 7 electronic doors to insure equal access to the office and the safety of the Plaintiff.

The Defendant( s) actions were discriminating and retaliation for the Plaintiff's activity in exposing $1.48 billion in billing loses. As result of the Defendant( s) 10 years of adverse responses and illegal actions was negligent to cause direct harm to the Plaintiff in producing physical and "emotional pain and suffering", inconvenience, mental anguish, chemotherapy, cancer, loss of bladder, prostate, and lymph nodes, 7 cases of sepsis, placement and removal of a nephrostomy tube, removal of  a 4.2 centimeter kidney stone leaving a 2.4 centimeter kidney stone,  extreme anxiety causing loss of 5 fingers and loss of functionality to left-hand, acute and chronic osteomyelitis [infection

11

in a bone] and 2 8 hours from death event and the enjoyment of life for 10 years and

now required to adjust the rest of life with those permanent chronic conditions impose

in those same 10 years for executing the GSA Administrator Dan Tangherlini (2012)

request to "double down" and 'make the GSA proud"; OIG Robert Nicholas 2012

findings and recommendations; PBS Commissioner, Norm Dong (2015) request for

national workload effects on funding, operation, and performance; and rights under the

Civil Service Reform Act of 1978, 5 U.S.C. § 7513, et seq, Whistleblower Protection

Act, Americans with Disabilities Act Amendments Act of 2008, and the Rehabilitation

Act

3. **Defendant( s)  GSA associates with disposition under oath**;

> Location; Region 4 Martin Luther King Federal Building, 77 Forsyth Street
> NW Atlanta, Ga 30303—same as Plaintiff where all offences occurred

>> 1. Gwen Gladman, Dir., Budget & Financial Mgmt. Div., OCFO
>>    RWA Branch Chief,  Zone 2
>>
>> 2. John Dennis, PBS Assistant Regional Commissioner
>>
>> 3. James Nastasi, BA53 Rental of Space, OCFO Zone 2 Branch
>>    Chief
>>
>> 4. Mike Goodwin, Region 4 PBS Regional Commissioner

Location: Region 7, 819 Taylor Street, Fort Worth, Texas 76102. GSA employees' phone numbers and email addresses can be obtained by visiting GSA's contacts page.

> 5. Roman Augustus, Director, OCFO Zone 2, Revenue/Leasing
>    FFO (the Plaintiff's 7 month tenure "administrative supervisor"
>    as of February 27, 2016)
>
> 6. Irena Matijevic, Region 7, Human Resource Specialist

Location: Region 6, 2300 Main St, Kansas City, MO 64108

> 7. Julie Pfohl, Director, OCFO Zone 2 (the Plaintiff's 7 month
>    tenured Deciding Official and factfinder)

4. **Defendant(s) GSA Associates Not Deposed** [interaction documented with series of emails or associated with series of GSA Grievances, EEOC and OSC filings]

> Location; Region 4 Martin Luther King Federal Building, 77 Forsyth Street NW Atlanta, Ga 30303—same as Plaintiff where all offences occurred
>
> 8. Jaron Chriss, R04, GSA Legal Counsel
>
> 9. Maletha Singleton, RWA Branch Chief, OCFO Zone 2
>
> 10. Kathy Day, Region 4, Director, Human Resources
>
> 11. Gary Samaha, Region 4, Deputy Director Human Resources

(retired)

12. Pattie Lomax, Director, Budget & Financial Management
    Division (retired)

13. Dawn Norman, Director, R4 Leasing (retired)

14. Victoria Corkren, Director, R4 Portfolio Division (retired)

15. Jamal Overton, Director, R4 Portfolio Division

16. Sabina Sims, Director, R4 Facilities

17. Courtney Deboard, Director, Design & Construction R4

18. Torre Jessup, R4 Regional Administrator (no longer w/ GSA)

19. Kelly Haynes, Region 4, GSA Facilitator

Location; 1800 F Street, NW Washington, DC 20405. GSA Headquarters
Building

20. Kathy Hammer, Director, OCFO Financial Services

21. William Strickland, Acting Director, OCFO Financial Services,
    GSA Alternative Dispute Resolution Representative (ADR)
    (2013), GSA Grievance Deciding Official (2013)

22. Steve Varnum, Director OCFO Revenue Division

23. Gerald Badorrek, Chief Financial Officer, GSA

24. Norm Dong, PBS Commissioner*

14

25.David Foley, PBS Assistance Commissioner*

*This Court should be enlightened as to what really wrong with GSA. Now as a private citizen my concern there has been several revelations that have been revealed in testimony of several senior GSA officials before Congress and in the national press about Norm Dong, PBS Commissioner, leaving GSA to work as Managing Director at FD Stone water, LLC, who in turn works for GSA, and Dan Tangherlini, GSA Administrator (2013) is tapped to lead a 2017 Booz-Allen-Hamilton project, Seamlessdoc. Then there is David Foley moves on from GSA after 15 years of service and after $1.48 billion in uncollected rent and $4.8 billion in building deficiencies. In September 26, 2018 "The Pension Benefit Guaranty Corporation announced the appointment of David Foley as Chief of Benefits Administration, where he will lead efforts to advance PBGC's commitment to pay accurate and timely benefits to retirees and beneficiaries". "David has served in senior leadership positions at PBGC and other federal agencies," said PBGC Director Tom Reeder. "This makes him an excellent choice to lead our benefits office, which carries out a vital aspect of our mission. "Before taking the lead at the Office of Benefits Administration, Foley had a well-established track record in managing large teams . All GSA associates are pleased with the success of our colleagues but are challenged by their legacy. Foley was the master of ceremony at the $850,000 Las Vegas Conference where his PBS Commissioner and

15

GSA Administrator had to resign. The Article goes on "In fiscal year 2017, the Office

of Benefits Administration started paying benefits to nearly 14,000 retirees in single-

employer plans. In the same year, the office paid $5.7 billion to a total of about 840,000

retirees from 4,845 failed single-employer plans".

David Foley is but one example how GSA elites PAD their resume at the expense of

$1.48 billion loss on 9,486 federal asset, with "titles" and "power" and not one attribute

as to "result achieved" or in Foley case while at GSA he contributed directly to 2006-

2016 operating, funding, and performance deficiencies and failed to take actions on

9,486 federal assets generating $9 billion revenue and valued at $40 billion becoming

fiscally insolvent in 2016. Unlike the Plaintiff who got fired in 2016 for resolving the

$4.8 billion fiscal mess Foley and other GSA elites directly contributed too. Foley and

cohorts survive into another prominent federal government position as Chief of Benefits

Administration, Pension Benefit Guaranty Corporation or managing partner in a private

contract doing business with the GSA.

<u>Administrative Procedures</u>

1) Whereas, Plaintiff documented all factual allegations in 7 GSA Grievances, 2 EEOC

Report of Investigation (ROI), Settlement Agreement, and 3 [2016] 29 C.F.R. Section

1614 filing to GSA Official of Civil Rights Robert Burnhart Director of EEOC Operation

all served and supported the Agency and Plaintiff positions. Therefore, it was absolutely

impossible to remove the Plaintiff from federal service under any legal justification. The only motive was to maliciously prosecute, harass, retaliate against and remove permanently the Plaintiff from federal service for his disclosures.

2) This Court will grant judgment in favor of Plaintiff given Agency knew that no investigative files can be provided in the Agency Plead document. The Agency has no evidence because Julia Pfohl, Deciding Official, stated, in actual testimony "I did not. I did not further investigate that". Further, on each of the 4 disciplinary actions [dated March 2016 to September 2016] Deciding Official testimony, "I did not" investigate prior to affirming the removal. APPX_C page 154-170

3) With respect to September 14, 2016 Letter of Propose Removal, Deciding Official and Factfinder stated; Charge 1 "I don't know the Answer to That", I can't recall"; Charge 2 "no"; Charge 3 "I don't have any basis to not accept it as credible [i.e. Plaintiff's evidence] I didn't investigate it further"; Charge 4 "No". APPX_C 170

4) Further, the record indicates the primary recipients of the Plaintiff's (11) Grievances (9771.1A OAD P GSA Grievance Procedures) sent prior to September 14, 2016 removal were Chief Financial Officer Gerald Badorrek OCFO (Washington. D.C.) and Irena Matijevic, Region 7, Human Resource Specialist (El Paso TX). The Agency had the testimony of Irena Matijevic, HR, Labor Relation conducted September 18, 2017 recognizing Gwen Gladman (OCFO), Roman Augustus (OCFO), James Nastasi (OCFO) and Julia Pfohl (OCFO) used Irena Matijevic to advise and write, the disciplinary letters, and with respect to Pfohl, advised, Factfinding, and wrote each Decisions Letters after 4

17

of Plaintiff's Grievances and September 14, 2016 Letter of Proposed Removal. According to Matijevic's [APPX_B page 101] testimony in accordance with GSA Order 9751.1 CPO(Revaluated) "Maintaining Discipline" OCFO officials;

    a.  "DID NOT" "Interview Plaintiff who has allegedly committed an offence",

    b.  "DID NOT" "Interview Augustus who alleged the offence";

    c.  "DID NOT" "Interviewed witnesses and any others who could have provided pertinent information";

    d.  "DID NOT" Try to reconcile any conflicting statements or other evidence and

    e.  "DID NOT" "Re-interview the parties concerned if appropriate" prior to any disciplinary actions or prior to a final decision.

5) In Irena Matijevic, HR, testimony on page 97 agreed that GSA Order 9751.1 CPO (Revaluated) "Maintaining Discipline" was established to provide instructions to GSA supervisors.

    a.  Further, under 4, "The Positive Meaning of Discipline" she agreed under 2, it says, "When the following factors are present, group discipline of a high order will prevail."

    b.  Matijevic, HR, agreed that two of the factors that it indicates should be present for group discipline of a high order is "Free communications upward and downward."

        i.  And another factor that should be present is "Freedom to express opinions and suggestion, with the assurance that they will receive consideration."

    c.  Finally, on page 97, Matijevic, HR, was ask, "Generally, what policies, if any,

does GSA have in terms of progressive discipline with respect to Warnings

Notices, Official Reprimands, Suspensions, or Removal.? Answer: That is, it

6) In Matijevic testimony she stated, "she wrote Roman's disciplinary letters, and with

respect to Pfohl, she assisted with Factfinding and writing the Decisions Letters after

each of Plaintiff Grievances and removal". On page 81, line 1 through 25, when

questioned whether;.

a. Q. a file of evidence should be provided to the Grievant for the Grievant review

before a report of findings is made. Correct? A.As I [Irena Matijevic] read it now,

yes.

b. Q. Okay. So, it is mandatory that the Grievant be able to review the file of

evidence before a report of findings is made. Correct? A. [Irena Matijevic],

Correct. If factfinding is done.

c. Q. Yeah. And then the two grievances on Plaintiff in which you were involved,

was a file of evidence provided before a report of findings is made that included

written summaries signed by interviewees of -- of all relevant interviews? A. I

[Irena Matijevic] believe Ms. Pfohl did not interview anybody. So no, he would

have not been provided copies of any interviews.

d. Q. Okay. Did you have any discussions with Ms. Pfohl about whether or --

whether she was going to be interview anyone in connection with those

grievances? And, secondly, if she did not interview anyone, why didn't she? A. I

[Irena Matijevic, ] don't remember.

19

5) As demonstrated, this case was created and maintained for 5 years off a "guess" and not the "substantial evidence" or high evidentiary burden of the government.

## Administrative Procedures After Removal

1) On October 13, 2021 Carlton M. Hadden, Director Office of Federal Operations stated there is no further right of administrative appeal on EEOC No.410-2018-00003X Agency No. 13-R4-B-0114. Now, the Plaintiff's right to file a Civil Action (P0610) against Robin Carnahan, Administrator, General Services Administrator (GSA) with United States District Court, Northern District of Georgia, Atlanta Georgia within ninety (90) calendar days or January 13, 2022.

2) This Court must appreciate some 4 years prior Carlton M. Hadden, Director Office of Federal Operations decision on July 27, 2017 Robert Burnhart, Director Office of Federal Operations on the same "Material Evidence" " Remanded" the Plaintiff's [2016] 29 C.F.R. Section 1614 filing to GSA Official of Civil Rights back to August 10, 2015 for continued processing. The Agency actions was "remanded" and stated, ' when one of the contracting parties [Agency] incur no legal detriment, the settlement agreement will be set aside for lack of consider". "We find the Agency incurred no legal detriment in this regard. See McNair vs. U.S. Postal Service." [page 9 ROI].

   a. The order was mandatory to restart the Plaintiff's concerns back to August 10, 2015 and before all the 6 disciplinary actions including the September 14, 2016 Letter of Proposed Removal. The Agency withheld this mandatory order to restart

20

the Plaintiff's concerns back to August 10, 2015, "genuine issues for trial" during
the December 13, 14, 2017 MSPB hearing and in the EEOC discovery/initial
conferences/petitions/briefs/oral arguments now before the Dorian Henriquez-
Simons Administrative Judge creating a "double and triple" jeopardy incidence.

b.  Such revelation demonstrates the Agency prosecuted the Plaintiff for 6 years with
"no genuine issues for trial", "no evidence to weigh Id. at 249"," no evidence to
draw justifiable inferences" to support the Plaintiff removal nor support for the
Agency's current position other than complete reinstatement.

c.  The Agency limited it scope of discovery and limited the Legal Analysis of the
whole record to conclude and to obscure the Agency's own negligence and liability
in creating and promoting a Hostile Work Environment (HWE).Pursuant to Robert
Burnhart, Director Office of Federal Operations on the same "Material Evidence in
2017 GSA HAS NO CAUSE TO REMOVE THE PLAINTIFF FROM FEDERAL
EMPLOYMENT whereas on October 13, 2021 Carlton M. Hadden, Director
Office of Federal Operations on the same "Material Evidence in 2017 GSA HAS
NO CAUSE TO REMOVE THE PLAINTIFF FROM FEDERAL
EMPLOYMENT. Both must agree reinstatement is the only legally and just
position for the federal government to take .

## Nature of the Case

21

1. The conduct complained about in this lawsuit involves the following:

   a. These same GSA Officials further removed the Plaintiff's 2011 GSA National Achievement Award in Asset Management programmatical and technical initiatives that Plaintiff created to support GSA's financial interest and long-term sustainability on federal building operation. Their efforts were unsupported even demanding "asset manager" and divisional leader not to use the Plaintiff advice or empirical findings equally damaging Plaintiff's reputation and maligning the solutions to 6 years OIG and GAO findings and recommendations.

   b. Both "Disability Harassment" had the equaling effect to disproportionately impose a negative impact on Qualified Disabled Senior Financial Adviser using these unlawful tactics that effected the Plaintiff's health and permanent reputation among other GSA associates,

      a) The Agency demonstrated a consistent pattern using similar conduct (1) interfering in mission critical projects to secure GSA interest (2) rejecting the Plaintiff's data, organizational concepts, analytical approaches, operational metrics, and in general a new streamlined approach for managing PBS Inventory.

      b) Whereas Agency interfered with the Plaintiff in the implementation of the findings of Inspector General Nicholas V. Painter (2012), Robert C. Erickson (2014) and Carol F. Ochoa, (2015)  critical to the agency

securing its mission and important to Plaintiff in securing the "benefits of

his employment" with GSA during the selection of the

1. Director B&FM Division (2009 & 2013),

2. Deputy Director of B&FM Division (2009 & 2013),

3. Director of Portfolio Division (2008),

4. Deputy Director of Portfolio (2008),

5. Chief of Staff (2016).

6. 'Chief Financial Officer" position under the Announcement 1300004-
   FMMP - GS-0501-V15 (2013)

7. Real Estate Portfolio Manager, GS- 1101FC-15, position in the Atlanta
   office [announcement number 1704013LLMP]

3) The resultant candidate and/or selecting official and panel members were successful

using their supervisory and management privileges to state untrue narratives to

adversely define Plaintiff efforts/initiatives to castigate doubt and harm on the

Plaintiff's career

## Discrimination

I believe that I was discriminated against because of the following:My disability;  Whereas,

the Plaintiff [Chronic Spinal Cord Injury—C6 level or Quadriplegic] in April of 1989

was hired by GSA  getting his GS-7 position benefiting from the Federal Government

specific focus on hiring people with or perceived disability

1. my opposition to a practice of my employer that I believe violated the federal anti-discrimination laws and my participation in a 2013 EEOC No.410-2018-00003X Agency No. 13-R4-B-0114 Report of Investigation followed by a 29 C.F.R. Section 1614 filing to GSA Official of Civil Rights due the GSA breached August 10, 2015 Settlement they signed to remedy the 2013 EEOC Agency No. 13-R4-B-0114 claim in the Report of Investigation. Whereas, on July 27, 2017 Robert Burnhart, Director Office of Federal Operations ruled in the Plaintiff favor. The GSA on July 27, 2017 and GSA on January 13, 2022 have no case against the Plaintiff.

## Plaintiff's Disability [ROI]

2. The Plaintiff asserted he has been a quadriplegic since June of 1978. He stated he has permanent paralysis from the chest down, affecting all four extremities and he is permanently confined to a wheelchair. The Plaintiff stated he was diagnosed in 1978 by Dr. Murray and Dr. Apple, resident Neurologist and Co-Medical Directors at the Shepherd Spinal Center in Atlanta, Georgia. The Plaintiff stated that GSA hired him during a period in 1989 to attract qualified disabled candidates to federal employment. He stated his disability is obvious from observation and GSA has documented his disability in his OPM personnel file as 079-paralysis. He reiterated that from 1989 to the present, all GSA PBS Supervisors have immediately become aware of his physical disability. The Plaintiff asserted he has been confined to a wheelchair for thirty-six (36) years and he plans to retire from GSA in the chair. He stated he has limits on his life activities including caring for himself, walking and performing some manual tasks. The Plaintiff and Agency have never needed to updated or modify documentation to

the Agency to substantiate his disability claim. He noted that prior to Pattie Lomax, all regional PBS management were very proactive in providing the necessary accommodations to ensure his success. The Plaintiff explained that he has been employed with GSA for twenty-four (24) years and all past management at GSA was aware of his condition and established earlier on in his career that reasonable accommodation would never be an issue. He noted his success at GSA up to 2012 was attributed to their support and unqualified access to program, data and management. He added that their confidence in his ability is represented in the breadth of his responsibilities as described in his position description.

Interference with Major Life Activities

3. Plaintiff is a person with disability within the meaning of Rehabilitation Act of 1973, in that his impairment substantially interferes with the major life activities as follows: (1) confined to a wheelchair for forty-two (42) years and he plans to retire from GSA in the chair. He stated he has limits on his life activities including (2) caring for himself i.e. dressing, bathing, transferring into and out of wheel chair, (3) need for personal care assistance 4 to 5 hours a day (5) handicap modified van for daily transportation. In the work environment use hand prosthesis to enable typing and taking notes at a slow pace whereas hand-writing is limited to signature, only. With the Plaintiff level of educations, access to computers, applications and Data places the Plaintiff in a superior position than many of his social and work cohorts.

Plaintiff's Prior Protected Activities

25

1. January 1, 2011 to December 31, 2011 Plaintiff asked for Reasonable Accommodation (RA), disclosing a medical condition, Bladder Cancer (stage 3) and it was approved by Pattie Lomax, Director of Budget and Financial Management Division, Region

2. December 15, 2015 to June 1, 2016 Plaintiff received Reasonable Accommodation from agency during the period to cover an extended period to care for major health issues. The Court should appreciate the timing of all the Charges 1, 2, 3 ,4 occurred during a period when Plaintiff and administrative supervisor, James Nastasi established an alternative work schedule during an indefinite period to recovery from Sepsis and a Kidney Stone extraction. These OCFO officials were fully informed and provided Plaintiff reasonable accommodation to work from home and approved through ALOHA [GSA Time and Attendance System] high use of Annual Leave and Sick Leave nevertheless the Agency remove the Plaintiff from federal service "Charge 2" for being AWOL 6 days, as was affirmed by the Court decision to vacate Charge 2

3. December 15, 2015 to June 1, 2016 Plaintiff received "reasonable accommodation" of the agency for the March 15, 2016 to May 17, 2016 by coordinating with the GSA Help Desk arranging system access modifications for the PIV Card [Deactivation] [per GSA IT recommendations as of March 15, 2016 and per the GSA Information Security (IT) Security Policy, CIO 210 2100.1J CHGE 1, Chapter 2, pages 32 section 19 paragraph 9e) as of April 28, 2016] to cover an extended indefinite period of time due to a health crisis. GSA Help Desk extended that reasonable accommodation by

26

providing Plaintiff 30-day Password until such time Plaintiff return to normal duty

hours in the Martin Luther King Building. Nevertheless, the Agency removed the

Plaintiff with a Charge 4 in that he violated GSA Information Security (IT) Security

Policy, CIO 210 2100.1J CHGE 1, Ch as GSA Order dated as of April 28, 2016.

Whereas a minimum time investigation the Plaintiff ALOHA record would reveal the

Plaintiff was in the Emory Hospital, Atlanta Georgia as a patient for the extraction of

a 4.2 cm Kidney Stone.

Essential Facts of Plaintiff's Claim(s).

1. First and foremost, Agency [all 7 disposed associate ] interfered with the Plaintiff's

implementation of the findings of Inspector Generals Nicholas V. Painter (2012),

Robert C. Erickson (2014) and Carol F. Ochoa, (2015) that created Low Tenant

satisfaction Scores and a $4.8 billion in building deficiencies --a substantial risk of

significant adverse impact on the GSA's ability to accomplish its mission which lead to

a letter of warning (2012), reduction in annual APPAS rating from 4 to 3 (2012),

reprimand (2013), 5 Day Suspension (2016) and APPAS reduction from 3 (2015) to

1 (2016) and ultimately the September 14, 2016 removal on the same all base

adverse command "don't communicate outside of chain of command, or face

disciplinary charges". Such adverse command was made to harass because each

knew the Plaintiff acquiesced each time and each still use the adverse command as

the pretext to justify 6 disciplinary actions to defame a handicap associates work in

front of other GSA associate to malign, impugn and segregate a qualified disable

27

associate's work and contribution away from facts or empirical evidence to avoid

their own culpability of discrimination, retaliation, and harassment and $1.48 billion

in gross waste, abuse and mismanagement of Taxpayer funds.

2. Further these adverse command would come out on after the Plaintiff's composition

   entitled "2016 Performance Diagnostic constituted protected disclosure under the

   WPA or WPEA was release around December of each of the past 10 year outlining

   those disclosures were a contributing factor to the agency's removal action. The

   Agency deliberately targeted the Plaintiff and the Content in the Performance

   Diagnostic to disproportionately imposed a negative impact on Qualified Disable GSA

   associate with the issuance of a series of "Don't Communicate outside of Chain of

   OCFO- nondisclosure policies (5 U.S.C. § 2302(b) (2012-2016) issued upon Robert

   exclusively leading to disciplinary actions and removal from federal service [Senior

   Financial Advisor, 28-years' Experience] perpetuating negative stereotype that a

   disabled associate's work is less than credible, inferior or not worthy of PBS

   management attention and has systemically affected Robert's performance in managing

   the funding, operation, and performance of the Region 4 inventory in accordance with

   the Performance Diagnostic,

3. Prior adverse actions describe above paragraphs (1-2) voided all Robert's right to an

   impartial interview and opportunity to compete equally among the 7 GSA candidates

   on December 6, 2016 for the for  Real Estate Portfolio Manager, GS- 1101FC-15,

   position in the Atlanta office [announcement number 1704013LLMP] because such

actions disproportionately imposed a negative impact on a Qualified Disable Candidate perpetuating negative stereotype that a disabled associate's work is less than credible, inferior or not worthy of PBS management attention and has systemically affected Robert's performance in managing the funding, operation, and performance of the Region 4 inventory in accordance with the Performance Diagnostic. As John Dennis, Interview Panel Member describes, Robert is Organizational, Programmatic, and Technically incompetent to perform as leader at GSA at the GS-15 Level

4. This Court must recognize the GSA actions describe in section (3) are consistent with GSA management averse actions against Robert in 2012 and beyond, same adverse action, different players. As mentioned Agency Representative has supported the implementation of a separate and unequal "non-disclosure policy upon Robert for 6 years, in fact, by defending GSA discriminating actions before the EEOC is to acknowledge Robert's GSA Grievance file to dispute the reduce APPAS scores (FY2012), Letter Warning (FY2013), and Letter of Reprimand (FY2013) outlining how these disciplinary actions were issued capriciously and arbitrary issues upon Robert without facts to malign, harass, retaliate and perpetuating view that a disabled associate's work is less than credible, inferior or not worthy of PBS [OCFO] management attention and further disproportionately imposed a negative impact on Qualified Disable Candidate for 'Chief Financial Officer" position under the Announcement 1300004-FMMP - GS-0501-V15 (2013).

5. The GSA has left out the exculpatory evidence detailed in the EEOC report of

29

investigation [GSA-13-R4-B-0114] confirmed by Sylvia Anderson EEOC Officer May
16, 2014, or affirmed by Jaron Chriss, GSA Legal Counsel advice and consent on the
August 10, 2015 Settlement Agreement in CRITICAL case were a disabled GSA
associate has claimed discrimination, harassment, and removed from federal services
under illegal pretext goes again to the creditability of the Agency Case. Especially,
when the Agency Representative allow the Agency to breach August 10, 2015
Settlement that he established for the Plaintiff to protect the Plaintiff from demands by
"administrative supervisor stating, "do not communicated outside chain of command"
(5 U.S.C. § 2302(b) and assure the Plaintiff as integral part of the Agency's
"affirmative program to promote equal opportunity and to identify and eliminate
discriminatory practices and policies"[ See 29 C.F.R. § 1614.102(a)].

6. The Court must appreciate that Jaron Chriss, GSA Legal Counsel [ hereafter "Agency
   Representative] was responsible for advising GSA on all personnel actions against
   Plaintiff and, in fact, counseled and advised GSA on executing an Augustus 10, 2015
   Settlement Agreement to "promote equal opportunity" for Plaintiff and 'to eliminate
   discriminatory practices of subordinated GSA managers.

7. In turn, Plaintiff was advised by Agency Representative to withdraw from EEOC case
   [GSA-13-R4-B-0114] from furthering an EEOC hearing with AJ Alyson Lynn Plaintiff
   as consideration for the agreement. The Agency Representative knows within 4 months
   of September 17, 2015 after GSA communicated Plaintiffs rights, duties, obligations,
   and authorities to 100s of OCFO/PBS officials, the Agency breached the Agreement.

30

The Agreement was paramount to insure Plaintiff had the opportunity to function

equally and successfully as a GSA employee without any threats of retaliation and

discrimination from immediate supervisors [Gwen Gladman and James Nastasi, and

later Roman Augustus or Julia Pfohl]. Not only did Plaintiff have to file a breach in

the Settlement Agreement on January 22, 2016 in accordance with the Agency

Representative's appeal provisions, the Court supported Plaintiff claims and later

vacated the Settlement Agreement in July 27, 2017 due to the Agreement did not

provide for comparable consideration from GSA.

8. As demonstrated in (1-7 "Disability Harassment") what other 12,000 full-time

   equivalent associates had to negotiate working under terms and conditions of

   employment as in negotiating with federal agencies to carry out the duties, obligation,

   and authorities that are already unambiguously provided in the Plaintiff's PD or

   negotiate protection from the Agencies use of nondisclosure demands when all federal

   employees are protected from violation section 107(b) and section 104(c) of the WEPA

   2012 and Civil Service Reform Act of 1978, 5 U.S.C. § 7513, et seq. Or required to

   negotiate with the Agency to replace 28 years of Reasonable Accommodation that

   were inadequate installed in the Martin Luther King FB in 2001 and illegally removed

   in 2011 in retaliation by requiring the August 10, 2015 Settlement Agreement assure

   the Plaintiff as integral part of the Agency's "affirmative program to promote equal

   opportunity and to identify and eliminate discriminatory practices and policies"[ See 29

   C.F.R. § 1614.102(a)]. Again the Complain right to an "affirmative program to

promote equal opportunity" already available in Americans with Disabilities Act
Amendments Act of 2008, and the Rehabilitation Act of 1973, makes it unlawful for a
federal employer to discriminate in compensation or in terms, conditions, or privileges
of employment [as in "Communication"] on the basis of disability

9.  The Agency knows the courts found that the appellant's composition entitled
"Performance Diagnostic: A Funding, Operation, and Performance Guide to Move the
PBS Regional Realty Program to Sustainability," which the Plaintiff sent to the
Agency's Regional Commissioner and other management officials on or about
December 5, 2015,

10. After Plaintiff release the Performance Diagnostic on December 5, 2015, Plaintiff had
fulfilled his obligation of APPAS agreement with James Nastasi signed on October 1,
2015 and had no official duty with GSA starting November 15, 2015 to June 1, 2016.
The Plaintiff set aside all his Annual Leave and Sick leave and requested Reasonable
Accommodation during a period when Plaintiff and administrative supervisor, James
Nastasi established an alternative work schedule during an indefinite period to recovery
from Sepsis and a Kidney Stone extraction.

## Adverse Action

Therefore all adverse events dated after December 5, 2015 are gratuitous attacks on the
Plaintiff's Performance Diagnostic and the GSA associates initiating the adverse
action is subject to 5 U.S.C. § 1215(a)(1)(A) for committing a 5 U.S.C. § 2302(b)
imposing disciplinary actions ranging from reprimand to removal, debarment from

32

Federal employment for up to five years, or an assessment of a civil penalty up to
$1,000.

**Adverse Action 1**

January 22, 2016 Gwen Gladman blocking OCFO Workload Review reports that PBS
Commissioner requested in May of 2015

1) Plaintiff Response to 1- 29 C.F.R. Section 1614 filing to GSA Official of Civil
   Rights, February 1, 2016 .

**Adverse Action 2**

February 1, 2016, Julia Pfohl (who became Deciding Official/Factfinder), "Oh my
gosh! So, what is the status of the action with HR? We need to take action
immediately! This is absolutely unacceptable... I'm embarrassed that he is
representing [the group]. J.A. 1987 (ellipsis in original).

    a. Why would or how can any Deciding Official and Fact Finder two months
after the Plaintiff compile the Performance Diagnostic 2015 for the
Regional Commissioner in accordance with the August 10, 2015
Settlement Agreement say, I'm embarrassed that he is representing [the
group]. J.A. 1987 (ellipsis in original)?

    b. Why would any Deciding Official and Fact Finder seek "So, what is the
status of the action with HR when the Deciding Official in testimony , " I
did not use legal counsel and relied on Irena Matijevic HR.". According to
Matijevic's [page 101] "no one interviewed Robert who has allegedly

> committed an offence"," no one interviewed witnesses...no reconciling of
> conflicting statements nor re-interview the parties prior to any disciplinary
> actions  GSA Order 9751.1 CPO (Revaluated)

## Adverse Action 3

On February 27, 2016  the CFO and OCFO Kathy Hammer (Washington D.C.) required Julia Pfohl (Kansas City, Mo.) to promote Roman Augustus (El Paso, TX.) as a GS-15 Director of Revenue over 3 Regions making him  the Plaintiff's (Atlanta, Ga.) "administrative supervisor.

> a. Prior to the promotion the Agency knew Augustus harassed a African-American
>    Female associate according to [ page 10. Line 13] testimony of Roman
>    Augustus, the Plaintiff's alleged accuser stated, '....he harassed... ",
>    "Excessive..." "essence was unfair expectations and excess supply of work..."
>    making her feeling overwhelmed with her responsibilities "Her name was
>    Rosaland Hunter".
>
> b. Unfortunately, while GSA settled with Hunter. Hunter's OBITUARY is more
>    telling of the impact of the on the job "harassment" reads, Rosaland Jovette
>    Hunter October 20, 1964 - November 26, 2018, " Rosaland was employed at
>    General Services Administration for 30 years and relocated to Washington, D.C.
>    and worked for the U.S. Office of Personnel Management until God called her
>    home." Rosaland Hunter communicates harassment to GSA, GSA settles but
>    never removes the "harasser" nor correct the life-long mental impact being
>    harassed by co-worker.

34

c.  Again, the Agency covered up Roman Augustus' harassment of black female
    associate by promoting him into a GS-15 Director of Revenue over 3 Regions
    making him the Plaintiff's administrative supervisor with what has been
    determined herein harass Plaintiff's with prohibited personnel practices 5 USC
    §2302(b ) (1)(2)(3)(4) (5)(6)(8)(9) and(13) as the pretext to 4 disciplinary
    actions and removal from federal service with absolutely no evidence.

## Adverse Action 4

Just 20 day of being hired Augustus issued the March 17, 2016 "do not communicated
outside chain of command" (5 U.S.C. § 2302(b) breaching the Settlement agreement or
interfering in the Plaintiff contract with the Agency to serve the GSA interest in accordance to
the March 15, 2015 Position Description.

## Adverse Action 5

21 days later , April 8, 2016 Letter of proposed 5 Day Suspension [Roman Augustus] with the
pretext the Plaintiff's disrespect Gwen Gladman December 14, 2014 "do not communicated
outside chain of command" (5 U.S.C. § 2302(b) demand and James Nastasi May 12, 2015
"do not communicated outside chain of command" (5 U.S.C. § 2302(b) demand knowing
both prohibited personnel actions 5 U.S.C. § 2302(b) were remedied by the CFO with a new
Position Description March 15, 2015 and the August 10, 2015 Settlement Agreement.

1) As result of **Adverse Action (4) and (5)**, the Plaintiff was required to file EEOC Appeal,
   April 13, 2016, (Agency Number: 13-R4-B-0114 EEOC Number: 410-2014-00405X

2) On April 22, 2016 the Plaintiff was getting no help from Juran Chriss GSA Legal Counsel

who created the August 10, 2015 Settlement Agreement nor from the OCFO who signed

off on the new PD and Settlement Agreement - file email GSA Interest vs 5 Day

Suspension informal request to Regional Commissioner Mike Goodwin.

All above Adverse Actions and Responses were harassing and bulling during an extended

health crisis  January 2016- June 2016 and was required to report April 28-30 to Emory

University Hospital, 4.2 CM Stone extraction

**Adverse Action 6**

On April 28, 2016 was the Release of GSA Order GSA Information Security (IT) Security

Policy, CIO 210 2100.1J CHGE the Agency used to justified GSA 225 Infraction [July 20,

2016] and September 14, 2016 Letter of Proposed Removal [ Charge 2- Charge 4,not sustain]

knowing Plaintiff was in Hospital on "Reasonable Accommodation" TW and Sick Leave and

Reasonable Accommodation.

**Adverse Action 7**

 As mentioned on April 22, 2016 the Plaintiff was getting no help from Juran Chriss GSA

Legal Counsel who created the August 10, 2015 Settlement Agreement. In fact on May

17,2016 the Plaintiff was required to fight against Jaron Chriss, Assistant General Counsel

opposition to original 29 C.F.R. Section 1614 filing to GSA Official of Civil Rights, February

1, 2016

1. On May 17,2016 the Plaintiff sent  his second  EEOC appeal to Agency No. 13-R4-B-
   0114/EEOC Number 410-2014-00405x

**Adverse Action 8**,

On May 20, 2016, the Plaintiff had to Response to Roman threats to issue GSA 225 Infraction.

**Adverse Action 9**

On June 28, 2016 Critical Rating of 1 and implementation Performance Improvement Plan The Plaintiff APPAS rating is redused from 3 to 1 based exclusively on "communication anomalies" by Roman Augustus. And yet Roman Augustus who was hired to fire the Plaintiff because of his experience harassing and firing a "african-american" female had a green light from the agency to target "Quadriplegic and Charge the Plaintiff as underperformer, lying, AWOL, IT hacker, challenging, undermining the authority of his supervisor and yet the Agency provides no file showing the compilations emails demonstrating Roman Augustus's administrative supervisor techniques or in the Plaintiff's case harassing, ridiculing, and maligning statements that has permanently affected the Plaintiff 's mental & physical health, as follows;

a.      "is [Portfolio Diagnostic] bereft of factual import, nonetheless, it is not something I read blithely";

b.      "founded on your opinion only and not determined by facts";

c.      "an abrasive approach in communication to both management and peers";

d.      "have little regard to its expediency and conduciveness to strengthening relationships";

e.      "continue to prefer a format compounded of false accusations and offensive

37

statements as your principal method of correspondence".

f.      "It is demonstrably incontestable that despite peremptory exhortations to strictly comply with supervisory guidance, your actions remain intractable in your defiant opposition to managerial directives.

g.      "Of equal value, in this and other correspondences, your written diction is often abundant with grammatical errors while the poor formulation of your sentence structure often leave the reader struggling in the exercise of seeking to deduce context and meaning. Certain fragments of your writing convincingly attest to your comprehension of the fundamental rules of grammar; please apply that understanding throughout your writing rather than on an arbitrary basis.

h.      "Once again, as you have been repeatedly admonished and directed, you are instructed to communicate and coordinate with me via email prior to contacting any level of leadership, within any program area in GSA.

i.      "It is disturbing that rather than striving towards and seeking to cultivate harmony and partnerships with management, alarmingly, you choose to supply an unconvincing predicate by which you purport the liberty to conduct yourself outside supervisory parameters.

j.      "The guidelines and directions I have issued to you are not subject to debate or negotiation. You are to adhere, without deviation, to supervisory instructions. Failure to do so may lead to disciplinary action.

The Administrator, Robin Carnahan should understand this Augustus' premeditated and

38

ubiquitous attack on a Quadriplegic during the same-time the Quadriplegic was on extended absences {December 15, 2015 -June 1, 2016} trying to cure from 7 cases of sepsis, placement and removal of a nephrostomy tube, removal of a 4.2 centimeter kidney stone on April 28, 2016, leaving a 2.4 centimeter kidney stone, loss of 2 fingers and partial loss of 3 fingers and loss of functionality to left-hand.

Note the context of Charge 2 and Charge 4, the Agency fired Smith on the bases of no signs of work on 5 days during extended absences (Charge 2) and violation

the agency's IT security policy dated April 28, 2016,[ i.e., the Complainant was in Emory University Hospital for removal of a nephrostomy tube, removal of a 4.2 centimeter kidney stone on April 28, 2016 and April 29, 2016.] Unlike Rosalind Hunter who died from harassment so far the Complainant has survived Cancer has no career.

The Agency knew the 87 page Performance Diagnostic document which in testimony Roman Augustus, Julia Pfohl and Gwen Gladman have never read making these statements are well beyond "bickering among colleagues" over policy difference this is abuse of authority and gratuitous statements to impugned and malign and to defame the Complainant. Note most of Roman statements were precipitated on the Complainant issuing "Good News" for the Agency. The Agency knew not one of Roman's gratuitous statements, if accurate, were used to support any of Roman's disciplinary actions April 8, 2016, June 28, 2016, and legal foundation for supporting the September 14, 2016 Letter of Proposed removal and the Deciding Officials decision to affirm April 7, 2017

**Adverse Action 10**,

39

Despite the Plaintiff complete and accurate response on May 20, 2016 on July 20, 2016

received a GSA Form 225 Record of Infraction

Due to Adverse Action 8,9,and 10 on July 7, 2016 Robert W. Smith vs General Services

Administration EEOC Appeal: Amendment: Retaliation (April 8, 2016).

## Adverse Action 11

On September 13, 2016, the Plaintiff filed GSA Grievances to PBS Commissioner,

Norm Dong, Chief Financial Officer, Gerald Badorrek, Regional Commissioner

(R4) Mike Goodwin and GSA Administrator, Denise Roth Turner, to offer $413

million Performance Improvement Plan (POI) including a plan to stop over $1.48

billion in lost lease capital to the Federal Building Fund. Then, on September 14,

2016 received a Letter of Proposed Removal. The Agency knows that Mike

Goodwin Regional Commissioner testimony (Appx-A page 2) "no one investigated

Plaintiff claims". "I discussed it with Norm Dong [PBS Commissioner] and then he

reached out to Gerald Badorrek [Chief Financial Officer], and it was agreed Mr.

Badorrek would respond to it". "Plaintiff had raised similar allegations in the past

and that I had had trouble reconciling these allegations". And so, then he [PBS

Commissioner] talked to Gerald"]. 5 U.S.C. § 2302(b)(8) prohibits a PBS

Commissioner, Norm Dong, Chief Financial Officer, Gerald Badorrek, Regional

Commissioner (R4) Mike Goodwin and GSA Administrator, Denise Roth Turner,

[federal supervisors] from taking the personnel action in removing the Plaintiff

40

because of a protected disclosers i.e. offer of $413 million Performance Improvement Plan (POI) including a plan to stop over $1.48 billion in lost lease capital to the Federal Building Fund. The record demonstrate was no response from the Regional Commissioner, PBS Commissioner or the Chief Financial Officer or assigns, no phone call, email or even the (25 day) regulatory and statutory investigation into claims.

**Adverse Action 12,**

After September 14, 2016 Letter of Proposed Removal, the Agency hired a IT Contractor using Taxpayers' funds to spy on the Plaintiff's phone and cell phone activity, GSA google emails received by or sent by Plaintiff, PBS Portal Access Report covering June 6, 2013, to December 12, 2016, GSA Access Management System (GAMS) Access Report showing activity from March 17, 2016 to May 17, 2016 and Rent Estimate Administration Audit Trail Report showing activity from March 17, 2016, to May 17, 2016 i.e. The IT Contractor found no nefarious activity . Kathy Day HR Director and Juran Chriss, Legal Counsel could have save government funds by reviewing the Plainiff email activity or request Pfohl, Augustus, Nastasi or Gladman to type in turn-over all emails received from Plaintiff would have been sufficient considering the charges.

**Adverse Action 13**

Given Adverse Action 12 was negative what justifies charging the Plaintiff with Charge1, Charge 2, Charge 3 or Charge 4 or even removal under GSA Information Security (IT)

41

Security Policy or as someone who was engaged in Cyber Crimes. Firing Plaintiff with Cyber Crimes is disguising the truth, firing a Qualified Disable associate serving GSA interest.

**Adverse Action 14**

On or about October 3, 2016, Plaintiff provided Mr. Augustus updates on his progress in re-evaluating the funding, operation, and performance of PBS inventory using FY2016 data. Plaintiff documented the updates and results in the week of October 17-21 task sheet, upon the development of the FY2017 Federal & Lease Dashboards. In an attempt to further develop his analysis, Plaintiff sought publicly available data. However, Mr. Augustus repeatedly thwarted Plaintiff's efforts to secure GSA's interests. For example, on October 6, 2016, Mr. Augustus prevented Plaintiff in seeking data from other PBS associates. Mr. Augusts stated in an e-mail to Plaintiff: I have been informed that you are forwarding questions to various individuals within the Revenue Division in Central Office. The questions are not of immediate relevance to your assigned tasks . . . In addition, your communications must represent the recognized priorities. In requiring that Plaintiff route data inquiries through Mr. Augustus, Mr. Augustus withheld critical data from Plaintiff. Mr. Augustus's actions are particularly concerning as the data is not sensitive and is equally available to all PBS associate through the PBS Portal.  Mr. Augustus's non-disclosure policy is intimately related to Plaintiff's whistleblower status.

2) On March 6, 2017, Mr. Augustus e-mailed Plaintiff asking him not to make any changes or updates to the Inventory Changes Rent Estimate web application for any of our zonal inventory. Plaintiff has been creating Inventory Change Sheets for 27 years. The significance of the sheets cannot be overstated. The results inform the Regional Commissioner on potential changes in funding, operation, and performance inventory. Plaintiff develops, tracks, monitors, and reconciles inventory changes for the rent estimate; and he calculates the effects of those changes, as well as the impact of inventory changes on performance measures.

**Adverse Action 15**

On March 8, 2017, Norm Dong, GSA Commissioner, announced his impending departure from GSA. In response to this announcement and in an effort to inform PBS leadership of Plaintiff's contributions to Mr. Dong's subsequent work, Plaintiff replied to Mr. Dong's e-mail to explain his financial projects. Plaintiff highlighted his Performance Diagnostic and his work in reviewing 250 separate algorithms to produce funding, operation, and performance data on all 9,432 federal assets throughout the 11 region network. Additionally, Plaintiff noted his efforts to identify OA, asset, and regional portfolio strategies to improve both regional and national planning by $116 million, in an effort to recapture $592.6 million in performance improvement

opportunities. He also noted the methods he provides in the Diagnostic to equitably infuse $1.507 billion in capital repair and alteration funding to each respective region. Plaintiff also included links to several documents in which he took initiative to set the fiscal foundation for resolving 16 years of organizational, operational, financial, and performance concerns of the GSA, OMB, OIG, and GAO.

Just like **Adverse Action 11, without any response from Norm Dong, CFO Gerald Badorreck, or Regional Commissioner Mike Goodwin, CFO Badorrek pushed to affirm the Plaintiff removal on April 7, 2017**

### Penalties

The honorable Administrator Robin Carnahan must stand up a represent the PBS Body-at Large because the "Performance Diagnostic" demonstrated $1.48 billion in loss capital, at a minimum, gross mismanagement and/or a gross waste of funds and that management action or inaction that creates a substantial risk of significant adverse impact on [ 9,486 federal assets or $40 billion of critical infrastructure owned by the American Taxpayer] the Agency's ability to accomplish its mission.

The Plaintiff has demonstrated the Agency was negligent in allowing 15 **Adverse Actions** affect  the agency efficiency in delivering space and services to 20,086 client-agencies. The Agency actions were gross mismanagement and/or a gross waste of fund of American Taxpayer that can only be resolve by severe penalties to all those

44

Genneral Services Administration Officials who had enough direct involvement,
engagement, relationship, or awareness to Plaintiff activities. The Plaintiff disclosures
are outline in previous 42 page. As with Plaintiff's previous disclosures in 2012, GSA
personnel continue to ignore Plaintiff's concerns even in 2021. As demonstrated in
previous 42 pages, the Agency and Agency Representative belabored due process
right with double jeopardy schemed was purposed to deplete a "Qualified
Whistleblower" and "Qualified Disabled Associate" financial resources and
emotional the "will" serving GSA interest as of the "Qualified Whistleblower" and
"Qualified Disabled Associate".

## Penalties

All the above mentioned GSA associates upon employment with the GSA agreed to
insure the U.S. Federal Property and Administrative Services Act of 1949, as amended
by Congress, to provide for the federal government an economic and efficient system
for the procurement and operation of buildings and yet all above GSA associates for the
period of FY2009- FY2016 were directly and indirectly responsible for rejecting the
findings of Inspector General Nicholas V. Painter (2012), Robert C. Erickson (2014) and Carol
F. Ochoa, (2015) and the Plaintiff for research, analysis, and reporting on public-
accessible GSA performance data. Even though each knew all GSA performance data
is commonly available to all GSA associates regardless of Grade, Titles or position in

the organizational chart and it is expected that GSA associate including associates with "protected status" use all available for the purpose in maintaining the GSA as a "an economic and efficient system for the procurement and operation of buildings"

This case of Robert W. Smith vs Robin Carnahan, GSA is civil action against claim violations and claim violators that will be resolve to the financial benefit of GSA's 20,086 client-agencies and American Taxpayer either through 5 U.S. Code § 1215 disciplinary action FEDERAL employee committed prohibited personnel practices (PPPs) 5 U.S.C. § 2302(b) which this Court should refer all Agency personnel [GS-14, GS-15 or SES] to the Office of Special Counsel (OSC) and or Office of Inspector Generals (OIG) who has the authority to investigate and prosecute violations;

    i) 5 U.S.C. § 1215(a)(1)(A) for committing a 5 U.S.C. § 2302(b) imposing disciplinary actions ranging from reprimand to removal, debarment from Federal employment for up to five years, or an assessment of a civil penalty up to $1,000.

    ii) Section Title 18, United States Code, Section 1001 can receive a maximum sentence of up to five years in prison for lying with intent to derail any investigation whereas this Court will be presented with the same evidence to establish the Agency knowingly and willfully; falsify , conceal or

coverup by any trick scheme or devise material fact, or makes or use any
false writings or document knowing the same contain any materially false,
fictitious or fraudulent statement representation {example} in developing
the Douglas factor [Carr Factors] 1, 2, and 3 to support and justify all
adverse actions including the reasonableness of the Plaintiff's removal[
Douglas vs. Veterans Administration, M.S.P.R. 280 (1981)

iii) under the authority of United States District Court, Northern District of
Georgia a referral to OSC or OIG to work with Agency's Contracting
Officer to modify, terminate or renegotiate Booz-Allen-Hamilton Contract
and other IT contract terms who were hired to improve the efficiency of the
GSA funding, operation, and performance and even request for False
Claim/Qui Tam remunerations See 5 U.S.C.75; 5 C.F.R. §731.202 for the
American Taxpayers, 20,086 Client's Agencies and source of the Agency's
remuneration and damages owed to Plaintiff.

iv) The Plaintiff is requesting this Court to use its authority in (i-iii) and "to
cast a bigger net" over all GSA associates and Contractors with a
Performance-Based Actions under Chapters 43 statutes that authorize the
federal government to demote or remove an employee for performance-
based reasons; (1) 5 U.S.C. § 4303 (which can only be used for failure in a

47

critical performance element); and (2) 5 U.S.C. § 7513 (which can be used

for performance or conduct that harms the efficiency of the service) either

used with chapter 43 because of its lower standard of proof or the ability to

impose a penalty that is not subject to outside review once the agency has

proven the performance failure. Whereas, all GSA associates have access to

the important operational and performance data regardless of Grade, Titles

or position in the organizational chart. GSA information and publications

archived and freely disseminated throughout GSA and easily available to

the public on the internet.

(1) Take the opportunity to review the FY2012, FY2013, FY2014, FY2015,

FY2016 Agency Financial Report under a category titled, Financial

Results by Major Fund - Federal Buildings Fund. Note for FY2014 and

FY2015, both the federal and lease sectors lost capital. The lease FBF

Net Revenue from Operation was ($106) million, ($73) million, ($63)

million and ($102) million for FY2013, FY2014, FY2015, and FY2016

respectively[2]. PBS has posted similar negative trends in all operating

---

[2] GSA Annual Financial Reports;  FY 2012  https://www.gsa.gov/portal/category/104131   FY 2013
https://www.gsa.gov/portal/category/105979   FY 2014 https://www.gsa.gov/portal/category/107063   FY 2015
https://www.gsa.gov/portal/content/119278   FY 2016 https://www.gsa.gov/largedocs/2016AFR11-15-2016f.pdf

years back to 2009.

(2) In fact, all that Plaintiff was doing the past 16 years was financially validating the OIG and GAO findings and recommendations. As evidence indicate, OCFO and PBS managers refuse to appreciate Robert's abilities to interpret the OIG and GAO recommendations and take all the OCFO/PBS programmatic data published by the OCFO ( 13 separate Databases) and through Diagnostic Steps using 250 separate algorithms, produce a Funding, Operation, Performance Strategy Sheet for each respective region based off an optimization plan for all 9,524 GSA real property (i.e. 1954 federal assets, 7,570 lease assets) to demonstrate to the PBS Commissioner, OCFO and 11 Regional Commissioners that a region (i.e., Region 4) can be positioned, if not in FY2017 maybe FY2018 or beyond;

(a) to eliminate the continual operational unreconciled BA 53 Rental of Space account (Lease Imbalance) of ($6.8) million in FY2016. From FY2009, these loses have accounted for the depletion of ($130) million in capital reserves to the FBF.

(b) to establish short-term, midterm, and long-term strategies inclusive of $34 million in performance improvements and $122 million funding

49

requirements to move 74 of your 136 productive federal assets from tier 3 to tier 2a or 1,

(c) to recapture $18.8 million in market based rent in federal inventory or, eliminate $9.9 million in O&M inefficiencies and reallocate to reinvest in under resourced assets,

(d) Implement those regional strategies to recapture the potential performance recovery of $9.28 million in FY17.

(e) To eliminate $15 million in ineffective rent planning and reducing the high level of rent volatility along with reducing overhead in managing troubled and late OA activation. The region started in FY17 with a negative $20 million Volatility in October.  Improved rent planning with client-agencies directly improves Tenant Satisfaction survey scores: As stated by Region 4 Regional Commissioner, "Agencies don't want to do business with GSA"

(f) Assure full funding of regional operation through improved resource justification processes. In FY16 underestimated the value of the regional program by $10 million in market based operational funds and $122 million in capital reinvestment fund derive through FBF capital reserves.

50

(3) As demonstrate in (1)- (4) the Agency failure to take action on Plaintiff's

disclosures§ 2302(b) and discipline and remove the Plaintiff while the Star

Track Report (Regional Commissioner +/- 3% variance report) demonstrated

the GSA continued to lose another $ 485 million in lease capital in 2017,

2018, 2019 and 2020 demonstrating the Agency motives was less about

improving the efficiency of organization or securing the mission of the GSA,

there motivation was to assure their illegal imposed "Harsh Work

Environment" [HWE] and related damaging health results of the Plaintiff

along with the Agencies non-space related "overhead" [$10,000.00 annual

bonus to "Top" GSA associates when the Agency was losing $1.48 billion]

added to the $480 million OCFO staff overhead and again, a $16 million a

year Booz-Allen-Hamilton contract that now as of 2016 cost the Agency

over $160,000,000.00 at the same time when the Agency and it's Contracting

exposures are 'fiscally" culpable in the losses in excess of $1.48 billion

**Jury or Judge**

The Plaintiff actually will put in a Motion for a Summary Judgement, if

denied and case goes to trial it should be heard by a jury trial.

## **Request for Relief**

As relief from the allegations of discrimination and/or retaliation stated above,

51

plaintiff prays that the Court grant Plaintiff 5 years of back pay since April 7, 2017 and legal expenses since September 14, 2016 by check or through electronic funds transfer, with interest and to adjust benefits with appropriate credits and deductions in accordance with the Office of Personnel Management's regulations no later than 30 calendar days after the date.

If a petition for review is filed by either party, The Court should ORDER the agency to provide interim relief to the Plaintiff in accordance with 5 U.S.C. § 7701(b)(2)(A). The relief shall be effective as of the date of this decision and will remain in effect until the decision of the District Court becomes final. As part of interim relief, the Court should ORDER the agency to affect the Plaintiffs' appointment to the same Position classified 00CA168 Position title: Senior Financial Adviser GS50115.

The Plaintiffs shall receive backpay, the pay and benefits of this position while any petition for review is pending, even if the agency determines that the Plaintiff's return to or presence in the workplace would be unduly disruptive. As part of interim relief, and mitigate unduly disruptive presence, the Court should ORDER Plaintiff to serve as a principal financial advisor within the General Services Administration, Public Buildings Service Commissioner Office as virtual associate on "administrative leave' with a senior office located in the Region 4 PBS Regional Commissioner Office, Peachtree Summit Building, Atlanta Georgia on the 25th floor or same location of the only floor urinal

52

customize for needs of C6 Chronic Spinal Cord Injury (SCI) or most known as

Quadriplegic in Atlanta, Ga. In this role, exercises the same significant responsibility

for providing advice to all regional PBS management located in 11 region regarding

critical budget and financial management activities and overall program performance.

Plaintiff will serve as Senior Adviser integrating the Performance Diagnostic approach

through GSA with existing Booz-Allen-Hamilton IT Contract [Award_Package_PA-

0006_BAH].

Notice to GSA, Plaintiff want to assist GSA in what started out at a minimum, gross

mismanagement and/or a gross waste of funds judicated in GSA administrative

Grievance process , as Private Citizen observing the in action of GSA OCFO and 18 F

Street Strategist with their engagement BAH and other IT contract vs the performance of

the GSA Financial Statement and the outstanding findings of findings of Inspector

Generals Nicholas V. Painter (2012), Robert C. Erickson (2014) and Carol F. Ochoa,

(2015) that created Low Tenant satisfaction Scores and a $4.8 billion in building

deficiencies --a substantial risk of significant adverse impact on the GSA's ability to

accomplish its mission falls definitely on GSA acquisition IT services and expansive

hiring during 2009-2016 OCFO transformation and reorganization process at added

overhead cost of $485-$500 million since inception, has elevated to a False Claim Act or

Qui tam action through testimony and news article published after the Plaintiff's removal

detailing ;

    1.GSA long-term IT $16,000,000.00 a year relationship with Booz-Allen-

Hamilton [BAH] or a 10 year valuation of $160,000,000 plus or minus, and

2. establishing 120 FTE Salary Range: $12,614,760 to $19, 980,000 per year to

support 18F - Strategist [Location: Washington, DC; Chicago, IL; San Francisco,

CA; New York, NY; Virtual (100% remote) base salary range for this position is:

GS-15 Step 1 - $105,123 to GS-15 Step 10 $136,659.]

3. increase the GSA Office of Chief Financial Officer (OCFO) staff to

$480,000,000.00

As demonstrated during the past 10 years there more annual funds being invested in GSA

personnel or IT overhead than maintaining the sustainability of the federal government

critical infrastructure. Further the relationship with GSA OCFO, 18 F Street Strategist &

BAH engagement on GSA IT data management has made the GSA less transparent and

organizationally incompetent in management and interpreting its own data and

progressively noncompliant to its own Office of Inspector General and General

Accounting Office findings and recommendations.

If the BAH, 18 F Street-Strategies and OCFO IT data management was effective why

would the OIG in 2014 after 10 years or $160,000,000 (BAH), $120,000,000.00 (18 F

Street Strategies), or $468 billion (OCFO overhead engagement state, "PBS needs to

improve planning, development, and implementation of IT systems...ensures the availability of quality data to support business and investment decisions".

Those adverse financial conditions discovered by the OIG in 2014 existed prior to 2014 and still exist in the financial results of the GSA in FY2021.

As of 2021, these billing losses and inefficiency will continue until GSA fully implements the recommendations of 2012 OIG of Nicholas V. Painter (2012)  At the time of our engagement in 2012, Region 4 loses was $19 million. Failure to fully implement the OIG (2012) recommendations has increased to over $130 million (R4) in loss capital to the Federal Building Fund and over $ 1.45 Billion nation-wide.

The Court should direct the Agency to place Plaintiff in his original position with hiring authority for 10-20 FTE with comparable skills and computers/servers comparable to BAH and others contractor while working with GSA OIG and OSC, and GSA Contracting Officers for a minimum of 5 fiscal years (1 years extension option) to assist Plaintiff updating manuals, IT algorithms, organizational initiates that were codified in 5 papers associated with being awarded the GSA National Achievement Award in Asset Management. The Plaintiff we lead a group under the title, "GSA Data Analytic" with the focus on prototyping "GSA Data Analytic" in all 11 regions closer to source of GSA Client-Agencies with apriority on non-congressional and a non- taxpayer funding solution nevertheless a guaranteed to enhance funding, efficiency and performance with

55

the implementation Inspector General Nicholas V. Painter (2012) finding PBS's poor

occupancy agreement and lease administration practices resulted in payment and billing

error (December 2011) and will have sufficient evidence to have the government

intervene as soon as January 16, 2022 [GSA DOJ, OIG and OSC, and GSA Contracting

Officers] under the authority of United States District Court, Northern District of Georgia

to terminate or renegotiate BAH contracts and other contract terms who were hired to

improve the efficiency of the GSA funding, operation, and performance and request for

False Claim/Qui Tam remunerations See 5 U.S.C.75; 5 C.F.R. §731.202  for the

American Taxpayers, 20,086 Client's Agencies and source of the Agency's remuneration

and damages owed to Plaintiff.

### Exculpatory Evidence

The Plaintiff file Complaint on January 11, 2022  a 71 pages to cover context for

reinstatement and not the breadth of damages or as resolution to adverse action to

discriminate, retaliate, Cyber-bully or creating a HWE for the means to fire the Plaintiff

for his disclosures.

The Agency deliberately left out 10 years exculpatory evidence in the Agency's October

13, 2020 legal analysis and conclusions without use the official EEOC portal covering

over 1209 pages of evidence 2009-2016 including the USPS contracted Report of

Investigation 2013 and other exculpatory evidence located  EEOC Combine

56

File.RFR.0014 (1).

In addition, the Agency has possession of September- October 2017 Videotape and Videoconference Deposition of 7 Critical GSA associates directly associated with Plaintiff case. Note 7 Depositions are in the possession of the Agency Representative. The Agency Representative organized and attended each deposition. Each deposition was more than 8 hours long and conclusively and factually complete demonstrating the Plaintiff claims and a "ABSOLUTE" breakdown of the Agency's justifications and decision to remove Plaintiff from federal service on April 8, 2017. These 56 hours of Disposition should serve and justify Office of Special Counsel and Office of Inspector General (OIG) referral and force criminal charges and associated damages. That should take place immediately upon decision to reinstatement.

Other nonpecuniary [i.e., non-monetary] losses."

1. Return of Plaintiff's complete copy of Plaintiff C: Drive located on the Region 4 server.

2. Relieve Plaintiff from all "non disclosure" requirements and assure all Plaintiff work located in C: Drive is removed for all proprietary restriction or subject Plaintiff to any restriction or future use of Plaintiff Performance Diagnostic approach by GSA Contractors or Subcontractor for the benefit is serving GSA Interest.

57

3. Any future use of Plaintiff's Performance Diagnostic approach and all related documents, reports and organizational initiatives by GSA, Contractors, or Subcontractors without Plaintiff's prior approval is strictly prohibited.

4. Receive a letter from the GSA Administrator to determine if he or she  a member of GSA President's Trump Transition Team in 2017 received a copy of Plaintiff disclosures and solutions to the disclosures outline in the attached, Performance Diagnostic Document and "Special Attention to GSA transition team.docx" soon after the President took office.

5. Plaintiff request same letter sent to the Chairman ,U.S. House Committee on Transportation and Infrastructure and declare that Bob Peck, PBS Commissioner (2009-2012) report on "Capital Asset Crisis: Managing Federal Assets with Dwindling Federal Building Fund" has been validated.

6. Give the Committee notice that due to violation of WPEA (2012) and EEOC regulations, GSA managers were successful in retaliating against a Quadriplegic GSA associates to have prevented Plaintiff with implementing operation and performance concerns addressed by the Office of Inspector General (OIG) (2012) (2014) (2015) and the General Accounting Office (GAO) 2001 and 2015.  What was $19 million (R4) loss in 2009 has now increased to $130 million (R4) in lost capital due to under-collection or over-payment of

rent in lease buildings. Similar lost on the national portfolio has increased to
over $1.48 billion since 2009.

a) Similar to resolve the Capital Asset Crisis of GSA, Plaintiff was unlawfully

prevented from executing the Performance Diagnostic Approach where 1

FTE can use all the OCFO/PBS programmatic data published by the OCFO (

13 separate Databases) and through 250 separate algorithms produce

funding, operation, and performance on all 9,432 federal assets throughout

the 11 region network and identify OA, Asset, and regional portfolio

strategies to improve both regional and national planning by $116 million, to

recapture $592.6 million in performance improvement opportunities and the

method to equitably infuse $1.507 billion in capital repair and alteration

funding to each respective region.

7. All documents, reports, etc. used in defending Plaintiff's Whistleblower
activities made available to the Office of Special Counsel

8. All documents, reports, etc. used in defending Plaintiff's Whistleblower

activities  made available to Tim Kaufman, Federal Union Communication

Director, especially the portion that deals with PBS Management Official

Training on the WPA 2012, HR procedures, and GSA Grievances. The Federal

Union would want to know if prior disciplinary actions on Union-members

should have their case revisited considering the knowledge and training of GSA Supervisors

9. Similar, Tim Kaufman needs to receive all performance document sent above in order to validate his November 30, 2009 article published in the Federal Times.org titled, "Old buildings, dwindling rent: GSA faces financial crisis. In the article Mr. Kaufman states " The fund [Federal Building Fund] as a whole does not have the same cushion of dollars to spend capital on Repairs &Alterations.

## Monetary Relief

Relief from the Agency negligence knowing for 26 years [1990-2016] the Agency have never submitted "reasonable accommodation" plans to EEOC for approval a deliberate violation of Section 501 of the Rehabilitation Act requires federal agencies to create affirmative action plans for the employment of people with disabilities, and to submit those plans to EEOC for approval. The Agency force the Plaintiff to function in a HWE at severe price to the Plaintiff's health (life) and through the Plaintiff dedication and perseverance in managing the funding, operation, and performance on $9-10 Billion in Revenue and $40 billion in asset value with just 1 FTE put the Plaintiff in condition for this Court and 2022 U.S. Congress to award Compensatory, Economic, out of Pocket Medical, Equitable Relief damages of $6,937,802.00 describes below with enhanced remedies [herein] totaling $112,000,000.00 add to

a False Claim/Qui Tam remuneration at $485,000,000 to 30% of $4.8 billion or $1.4 Billion. All dollars deserving given the Negligence & Legal Duty Failures under section 107(b)m of the WPEA and section 104(c) which Adds remedies for Whistleblowers Subject to Retaliations.

The level of monetary request is reflected of the extend how 9 years [2008-2017] discrimination, retaliation, and harassment has affected the Plaintiff former Senior Financial Officer hereafter known as "Plaintiff's" long-term health and career in serving GSA interest and, how GSA inaction heightened the fiscal damage to the funding, operation, and performance on 9,486 federal assets OR AS KNOWN as the $40 billion 'CRITICAL' federal infrastructure of the American Taxpayers.

The level of monetary request and damages describe herein could have absolutely been avoided if the General Services Administration would have prevented a minimum of 25 critical General Services Administration Officials who had enough direct involvement, engagement, relationship, or awareness to Plaintiff activities resolving the operating issues, finding, and recommendations of GSA's distinguished Inspector Generals (i.e. Nicholas V. Painter (2012), Robert C. Erickson (2014) Carol F. Ochoa, (2015), after careful review of GSA financial operation has provided PBS with following operational and performance inefficiencies;

1. GSA emphasis on aggregate funds from operations performance masked individual property performance

2. PBS's poor occupancy agreement and lease administration practices resulted in payment and billing errors

3. PBS needs to improve the management and use of federal real property

4. PBS faces several challenges in satisfying its mission to meet its customers' needs effectively, efficiently, and economically.

5. The FBF was having difficulty generating funds to meet the capital needs of GSA's portfolios

6. GSA continues to restructure its organization, it should reassess its controls and systems and evaluate the result.

7. Improved planning, development, and implementation of IT systems are needed to ensure the availability of quality data to support business and investment decisions.

8. GSA needs to develop a portfolio strategy to meet OMB's reduce the "footprint" initiative.

9. GSA was developing asset strategies based on Tiering and core analysis, it was not developing steps to implement the strategies

10.Further, as mentioned above, in 2015 Region 4 PBS management received a

62

GAO report titled, GAO-15-609 Needs to Determine Progress toward Long-
term Sustainability of its Portfolio.

If one reads these recommendations --it is definitive that the OIG and GAO is requesting
PBS to get its own house in order.

Instead of these 24 GSA associates relying on these independent and objective bodies
truly laying the foundation how GSA PBS should proceed in managing the $40 billion
($3 billion R4) Real Estate Portfolio and $10 billion ($953 million R4) in Revenue on
behalf of its client- agencies and of the American Taxpayer each chose to place a 9 years,
impenetrable - moratorium on Plaintiff's[ Chronic C6 Spinal Cord Injury-Quadriplegic]
work and, only the Quadriplegic's work that won a 2006 and 2007 Federal Executive
Board award,  2011 GSA National Achievement Award for Asset Management—Or
Asset Management or solutions to cure the fiscal damage of $1.48 billion to the funding,
operation, and performance on 9,486 federal assets OR AS KNOWN as the $40 billion
'CRITICAL' federal infrastructure of the American Taxpayers; primary feature in the
Nicholas V. Painter (2012) findings and recommendations; (1) and (2); and whose work
was revised to the findings and recommendations (3) through (10) of  Robert C. Erickson
(2014) and Carol F. Ochoa, (2015),; and whose work gain praise from General Services
Administration Daniel M. Tangherlini 04/03/12 - 02/21/15 requested Plaintiff in 2012
"double down....yield tangible results.... that we [GSA] can proud of" [from the

compiling of the Performance Diagnostic on 9,486 federal assets representing $40 billion in valued federal infra-structure owned by the American Taxpayers] ...."...fantastic.. lead the effort"

Again, instead of these 24 GSA associates relying on these independent and objective bodies they established draconian restriction 1st Amendment rights of speech, communicating, and yet fail to promote, validate, review, take-action or expedite GSA interest. Instead demonstrated to unlawfully stall and interfere with mission critical projects and programs to deliberately shame, impugn, malign, and ruin Plaintiff's reputation with all GSA colleagues in Central Office and in the Region. What started out to $19.0 million lost in lease capital in 2012 grew to $130 million loss in Region 4 and over $1.48 billion loss in lease capital nationwide.

## Money damages (list amounts)

1. With or Without Reinstatement GSA assures Plaintiff $2.4 million in actuarial earnings [nonnegotiable] with no offsets due to the level of intentional discrimination and retaliation producing physical and "emotional pain and suffering", inconvenience, mental anguish, chemotherapy, cancer, loss of bladder, prostate, and lymph nodes, 7 cases of sepsis, placement and removal of a nephrostomy tube, removal of a 4.2 centimeter kidney stone leaving a 2.4 centimeter kidney stone, loss of 5 fingers and loss of functionality to left-hand,

acute and chronic osteomyelitis [infection in a bone] and 8 hours from death event and the enjoyment of life for 10 years and now required to adjust the rest of life with those permanent conditions impose in those same 10 years.

2. Compensatory and non-pecuniary damages; Until the WPEA, whistleblowers were generally limited to economic damages, out-of-pocket medical costs, attorney fees and equitable relief (e.g., reinstatement, rescinding a suspension, modifying a performance evaluation, etc.)  Estimates will be refined prior hearing

   a) Attorney Fees:  $300,000.00 of the total not reimbursed by U.S. Court of Appeal, Federal Circuit

3. Economic Damages:

   a) Salary Loss $130,000 per year or $10.833 per month for the period of May 2017 to January 31, 2022 or 4.9 months  $651,700 plus interest and cost of living adjustment and scheduled step increases from Grade 14 Step 9.

   b) Removal of TSP fund of $399,000 invested in I and C Fund generated a $45,500 return (Dow: 23,450) from November 6, 2016 to April 7, 2017 (Notice of Dismissal)- and now the Dow Index currently trading at 32,456 another 52.09%  return- Economic Losses $2,532,241

4. Out-of-pocket Medical Costs

a) Medical Expense: $20,000 to $40,000 deductible portion for 3 ICU visits at Spalding WellStar Hospital, Griffin Ga.

b) $2067 PreMobil Wheelchair Recliner

c) NuMotion Invoice: $1,030.00 Wheelchair Casters replacement 5/23/2017

d) Plaintiff request recovery of $426 per month Government share of Federal Employees Health Benefits Plan on a total monthly premium of $698.27 (5/17/2017-08/31/2018) 16 months totaling $11,172.32

e) Plaintiff request all medical costs incurred 5/17/2017 and 12/31/2021 due the difference in Medicare Health plan rather than the Federal Employees Health Benefits Plan; TBD upon request

5. Equitable Relief:

a) Now through the negligence of current GSA managers, Plaintiff for 4.9 years without a GSA income or GSA insurance has been forced on $2,750 a month Social Security Disability Income and Medicare at the heighten period of increased hospital and doctors care expenses. Further due to these conditions Plaintiff was force to live within the home of his 88 year old father having to sale his handicap accessible home for the equity to afford his health care, payment to handicap accessible van, and nursing services 2 times a day.

$25,000.00 potential tax on the equity of the sale.

b) Plaintiff would ask $95,000.00 or the recovery of 10% penalty and tax associated with early withdrawal of TSP fund TSP Funds-used for Lawyer fees, personal care assistance, payment on handicap accessible van, health insurance premiums and other sundry livings expenses

c) Plaintiff Request full and continued participation in Federal Employees Health Benefits Plan for  the remaining 10 years of useful work life;

d) Plaintiff request FY2016 APPAS rating of 1 as of September 31, 2016 established at rating of 5, 4 or no less than 3 and all bonus calculations should be made accordingly. $1,000.00 - $2,000.00.

e) Plaintiff request all disciplinary actions residing on Plaintiff's personnel records be removed and compensation for the 5 Day Suspension be return $5,540.00

f) Due to improper and discriminatory personnel action(s) have limited and even prohibited Plaintiff the full benefit of employment. The mere fact that the Senior Financial Advisor is currently a GS-14/9 operating under the authorities of a PD for 19 years demonstrates that GSA has imposed GS-15 management limitation. In fact, Plaintiff was deemed highly qualified by HR on more than 7

GS-15 positions and unqualified by accused said parties and, therefore has placed the integrity of the GSA and good standing of the GSA as a Section 501 "Model Employer" at risk.

g) Plaintiff request current position  00CA168 Financial Management Analyst Position Description (PD)) as classified with all the duties, authorities and enumerated responsibilities be re-evaluated at the GS-15 based on Scope & Effects, Contacts/Purpose of Contacts, Complexity and Limited Supervisory Controls and all salaries earned at GS-15 for September 2012 to September 2018 be added

   i)   Economic Damages: (1) Salary Loss $130,000 based on Desperate Treatment correspondence described, herein

6. Enhanced Remedies

a) Plaintiff request total damages of $6,937,802.00 describes above [a-g] along with enhanced remedies [herein]  totaling $112,000,000.00 with False Claim/Qui Tam remuneration at  485,000,000 to 30% of  $2 billion or $600,000,000.00

   i)   for the Agency use of prohibited personnel practices 5 U.S.C. § 2302(b) as the foundation for retaliation including

ii) removable `of 26 years of necessary "Reasonable Accommodations,

iii) implementation of an Hostile Work Environment,

iv) the deliberate removal of award winning IT reporting & systems that demonstrated to serve GSA sustainable fiscal interest more than the increased overhead strategy for OCFO and 18 F Street Strategist staff or the IT support for BAH contract,

v) 9 retaliatory disciplinary actions post prohibited personnel practice, and

vi) false EEOC Affidavits to malign and disproportionately affect an otherwise qualified disabled candidate's work, advice, duties, obligations and authorities in servicing GSA interest

vii)      along with maligning Plaintiff effort to institutionalize OIG and GAO findings and recommendations .

b) Plaintiff request damages of 30% of $160,000,000 [value of a 10 year [Award_Package_PA-0006_BAH] ] or some portion of $48,000,000.00 from both or either BAH or GSA due to these GSA organization directly destroyed Plaintiff's Asset Planning Compiler IT system that was successful in 2002-2008 in accordance with  a GAO report titled, GAO-15-609 Needs to Determine Progress toward Long-term Sustainability of its Portfolio.

Demonstrating the GSA Officials are so blinded by animus toward Plaintiff

they could not appreciate the capabilities of one Quadriplegic associate [ 1 FTE

], not the $485,000,000 OCFO overhead or the $160,000,000  Booz-Allen-

Hamilton IT Contract] [Award_Package_PA-0006_BAH],

Again the Agency won the battles 2012 -2016 but will never enshrine the Agency

negligence and misuse of government power and silence forever the true legacy of

the Plaintiff who has now won for the American Taxpayer, a GSA National

Achievement Award in Asset Management winner and a GSA associate serving the

interest of the United States of America.

## PLEASE READ BEFORE SIGNING THIS COMPLAINT

Before you sign this Complaint and file it with the Clerk, please review Rule 11 of

the Federal Rules of Civil Procedure for a full description of your obligation of good

faith in filing this Complaint and any motion or pleading in this Court, as well as the

sanctions that may be imposed by the Court when a litigant (whether plaintiff or

defendant) violates the provisions of Rule 11. These sanctions may include an order

directing you to pay part or all of the reasonable attorney's fees and other expenses

incurred by the defendant(s). Finally, if the defendant(s) is the prevailing party in this

lawsuit, costs (other than attorney's fees) may be imposed upon you under Federal

Rule of Civil Procedure 54(d)(l).

Signed, this 11th day of January 2022

(Signature of plaintiff *pro se*)

*Robert W. Smith pro se*

151 Loumae Road
Griffin, Ga. 30224
770-584-5850
Robertw.Smith@att.net

71



## Planet **Depos**®

We Make It *Happen*™

# **Transcript of Michael Goodwin**

**Date:** September 20, 2017

**Case:** Robert W. Smith -v- Timothy O. Horne, Acting Admin., General Services Admin.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

Transcript of Michael Goodwin
Conducted on September 20, 2017                    146

| | | |
|---|---|---|
| 1 | be -- well, it's all in one email.  It's an email from | 16:38:49 |
| 2 | Mr. Smith to you and to Norman Dong and | 16:38:55 |
| 3 | Gerard Badorrek dated September 6th, 2016.  Did you | 16:38:58 |
| 4 | refer to this email a few minutes ago? | 16:39:05 |
| 5 | A    Yes. | 16:39:08 |
| 6 | Q    And who is Mr. Dong? | 16:39:10 |
| 7 | A    He was the previous Public Buildings Service | 16:39:13 |
| 8 | commissioner. | 16:39:17 |
| 9 | Q    Okay.  And Mr. Badorrek and -- correct my | 16:39:25 |
| 10 | pronunciation. | 16:39:28 |
| 11 | A    I believe it's Badorrek.  He's the chief -- | 16:39:30 |
| 12 | Q    Badorrek. | 16:39:30 |
| 13 | A    Yeah.  He's the GSA chief financial officer. | 16:39:30 |
| 14 | Q    Okay.  And did you review this at the time | 16:39:45 |
| 15 | you received it? | 16:39:49 |
| 16 | A    Yes. | 16:39:51 |
| 17 | Q    And did you discuss it with anyone at the | 16:39:56 |
| 18 | time that you received it? | 16:39:58 |
| 19 | A    I believe I discussed it with Norman Dong. | 16:40:00 |
| 20 | And then he reached out to Gerard Badorrek, and it was | 16:40:04 |
| 21 | agreed that Mr. Badorrek would respond to it. | 16:40:11 |
| 22 | Q    So when you reached out to Mr. Dong, tell me | 16:40:23 |
| 23 | what you and Mr. Dong discussed in relation to this | 16:40:27 |
| 24 | email from Mr. Smith. | 16:40:30 |
| 25 | A    I don't recall the exact conversation.  I | 16:40:34 |

| | | |
|---|---|---|
| 1 | mean, I was able to share that, you know, Mr. Smith | 16:40:39 |
| 2 | had raised similar allegations in the past and that I | 16:40:42 |
| 3 | had had trouble reconciling these allegations.  And so | 16:40:49 |
| 4 | then he talked to Gerard.  And we felt it was most | 16:40:55 |
| 5 | appropriate that he was really the subject matter | 16:41:01 |
| 6 | expert on this particular area and that he would | 16:41:05 |
| 7 | reply. | 16:41:08 |
| 8 | Q    Okay.  And so you understood that Mr. Smith | 16:41:11 |
| 9 | was raising some of the same issues and concerns that | 16:41:17 |
| 10 | he had raised a number of times in the past; correct? | 16:41:20 |
| 11 | A    Correct. | 16:41:24 |
| 12 | Q    And did you understand that he was -- would | 16:41:27 |
| 13 | it be accurate to say that he was in this | 16:41:32 |
| 14 | communication attempting to defend himself and | 16:41:35 |
| 15 | preserve his career with GSA? | 16:41:40 |
| 16 | A    I would say so. | 16:41:42 |
| 17 | Q    Okay.  Did you express any opinions to | 16:41:48 |
| 18 | Mr. Dong or to anyone else about whether Mr. Smith | 16:41:53 |
| 19 | should be subject to any kind of disciplinary action? | 16:41:59 |
| 20 | A    No. | 16:42:05 |
| 21 | Q    And did you forward this or discuss it with | 16:42:07 |
| 22 | anyone other than Mr. Dong and Mr. Badorrek? | 16:42:11 |
| 23 | A    I don't recall. | 16:42:19 |
| 24 | Q    Specifically, do you recall forwarding it to | 16:42:25 |
| 25 | anyone in Mr. Smith's direct supervisory chain, | 16:42:27 |

Transcript of Michael Goodwin
Conducted on September 20, 2017                    148

| | | |
|---|---|---|
| 1 | including -- well -- or through Julie Pfohl? | 16:42:32 |
| 2 | A    I'm sorry.  But I don't recall if I did or | 16:42:38 |
| 3 | not. | 16:42:40 |
| 4 | Q    Okay.  Do you know what kind of response | 16:42:43 |
| 5 | Mr. Badorrek provided? | 16:42:47 |
| 6 | A    I don't recall seeing that response. | 16:42:50 |
| 7 | Q    Did he indicate anything to you and Mr. Dong | 16:42:59 |
| 8 | in terms of how he intended to respond? | 16:43:01 |
| 9 | A    He did not speak to me directly.  The | 16:43:07 |
| 10 | conversation was between Norman Dong and Gerard. | 16:43:10 |
| 11 | Q    Okay.  Do you have any knowledge of -- well, | 16:43:16 |
| 12 | do you know what a form 225 Record of Infraction is? | 16:43:27 |
| 13 | A    No. | 16:43:32 |
| 14 | Q    Do you have any knowledge of a Form 225 | 16:43:36 |
| 15 | Record of Infraction being issued to Mr. Smith in | 16:43:40 |
| 16 | approximately July of 2016? | 16:43:43 |
| 17 | A    No. | 16:43:46 |
| 18 | Q    Well, since you don't have any knowledge of | 16:43:47 |
| 19 | that, is it accurate that you didn't have any input or | 16:43:52 |
| 20 | any kind of involvement in whether that Record of | 16:43:56 |
| 21 | Infraction should be issued and how it should be | 16:43:59 |
| 22 | resolved? | 16:44:04 |
| 23 | A    That's correct. | 16:44:05 |
| 24 | Q    Okay. | 16:44:07 |
| 25 | MR. HARRINGTON:  And if we could mark | 16:44:11 |

| | | |
|---|---|---|
| 1 | Exhibit 20, which you should have as | 16:44:13 |
| 2 | Exhibit 16. | 16:44:14 |
| 3 | (Marked for identification, Exhibit | 16:44:50 |
| 4 | No. 20.) | 16:44:50 |
| 5 | BY MR. HARRINGTON: | 16:44:53 |
| 6 | Q     This document marked as Exhibit 20 is the | 16:44:55 |
| 7 | Notice of Proposed Removal from Federal Service, sent | 16:44:58 |
| 8 | to Mr. Smith by Roman Augustus on September 14th, | 16:45:03 |
| 9 | 2016.  Were you consulted at all or otherwise involved | 16:45:08 |
| 10 | in the issuance of this Notice of Proposed Removal? | 16:45:14 |
| 11 | A     No. | 16:45:19 |
| 12 | Q     Did you have any role or any input in terms | 16:45:23 |
| 13 | of this being issued or how it should be handled? | 16:45:26 |
| 14 | A     No. | 16:45:30 |
| 15 | Q     When, if ever, were you made aware of this | 16:45:35 |
| 16 | Notice of Proposed Removal? | 16:45:38 |
| 17 | A     When I saw it in your exhibits this morning. | 16:45:40 |
| 18 | Q     When, if ever, were you made aware that | 16:45:55 |
| 19 | Mr. Smith's removal -- his proposed removal had been | 16:45:58 |
| 20 | resolved by removing Mr. Smith from his career with | 16:46:04 |
| 21 | GSA? | 16:46:10 |
| 22 | A     Honestly, I do not recall formal | 16:46:18 |
| 23 | communication, when that actually took place. | 16:46:19 |
| 24 | Q     Do you recall some sort of informal | 16:46:26 |
| 25 | communication by which you were made aware of that? | 16:46:29 |



## Planet **Depos**®
We Make It *Happen*™

# **Transcript of Irena Matijevic**

**Date:** September 18, 2017

**Case:** Robert W. Smith -v- Timothy O. Horne, Acting Admin., General Services Admin.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

Transcript of Irena Matijevic
Conducted on September 18, 2017                    94

| | | |
|---|---|---|
| 1 | Q.   Okay.  Yeah.  We can look at those | 12:36:08 |
| 2 | later. | 12:36:10 |
| 3 | Just for the record, who was Ms. | 12:36:11 |
| 4 | Gladman? | 12:36:13 |
| 5 | A.   It's my understanding she is part of the | 12:36:19 |
| 6 | OCFO leadership staff and at one point in time, | 12:36:21 |
| 7 | also, supervised Mr. Smith. | 12:36:26 |
| 8 | Q.   What discussions have you had with Ms. | 12:36:28 |
| 9 | Gladman regarding Mr. Smith and any disciplinary | 12:36:40 |
| 10 | actions taken against him? | 12:36:44 |
| 11 | A.   I did not have any discussions with Ms. | 12:36:45 |
| 12 | Gladman. | 12:36:48 |
| 13 | Q.   With regards to Mr. Smith, or with | 12:36:53 |
| 14 | regard to anything? | 12:36:55 |
| 15 | A.   Yeah.  I've never spoken with Ms. | 12:36:56 |
| 16 | Gladman. | 12:36:59 |
| 17 | Q.   Okay.  And is that because unlike | 12:37:04 |
| 18 | Mr. Augustus, she worked in Region VII? | 12:37:05 |
| 19 | A.   Okay. | 12:37:14 |
| 20 | Q.   Well, what did Mr. Augustus tell you, if | 12:37:15 |
| 21 | anything, in terms of, you know, whether he was | 12:37:18 |
| 22 | reiterating a restriction already placed, | 12:37:21 |
| 23 | attempted to be placed on Mr. Smith on Ms. | 12:37:25 |
| 24 | Gladman or whether he was instituting something | 12:37:27 |
| 25 | new separate and apart from what Ms. Gladman had | 12:37:32 |

Transcript of Irena Matijevic
Conducted on September 18, 2017                          95

| | | |
|---|---|---|
| 1 | done? | 12:37:35 |
| 2 | A.   My understanding was Mr. Augustus, as | 12:37:41 |
| 3 | the new supervisor wanted to clarify, what his | 12:37:42 |
| 4 | expectations were with Mr. Smith. | 12:37:45 |
| 5 | Q.   Okay.  Did you discuss with him whether | 12:37:54 |
| 6 | he was reiterating Ms. Gladman's restriction or | 12:37:57 |
| 7 | not? | 12:38:01 |
| 8 | A.   I don't remember if it was specifically | 12:38:01 |
| 9 | reiterating Ms. Gladman's instructions. | 12:38:16 |
| 10 | MR. HARRINGTON:  Okay.  Mark | 12:38:39 |
| 11 | Exhibit 6 which has been sent to GSA as | 12:38:40 |
| 12 | "Exhibit 5." | 12:38:43 |
| 13 | (Deposition Exhibit Number 6 is | |
| 14 | marked.) | 12:39:08 |
| 15 | THE COURT REPORTER:  It is so | 12:39:08 |
| 16 | marked. | 12:39:10 |
| 17 | MR. HARRINGTON:  Pardon me? | 12:39:10 |
| 18 | THE COURT REPORTER:  It is marked. | 12:39:12 |
| 19 | MR. HARRINGTON:  Okay.  Thank you. | 12:39:13 |
| 20 | BY MR. HARRINGTON: | |
| 21 | Q.   Is the document you have in front of you | 12:39:15 |
| 22 | marked as "Exhibit 6," 9751.1 CPO (Revaluated) | 12:39:16 |
| 23 | Maintaining Discipline"? | 12:39:23 |
| 24 | A.   Yes. | 12:39:25 |
| 25 | Q.   Okay.  And are you familiar with this | 12:39:30 |

Transcript of Irena Matijevic
Conducted on September 18, 2017                                  96

| | | |
|---|---|---|
| 1 | document -- | 12:39:32 |
| 2 | A.   Yes. | 12:39:32 |
| 3 | Q.   -- or GSA order? | 12:39:32 |
| 4 | A.   (Nods.) | 12:39:34 |
| 5 | Q.   Okay.  And generally, what is this GSA | 12:39:36 |
| 6 | order and what's its purpose and what's -- | 12:39:38 |
| 7 | A.   It provides instructions to supervisors | 12:39:43 |
| 8 | on how to discipline employees. | 12:39:45 |
| 9 | Q.   Okay.  If you look at the bottom of the | 12:39:59 |
| 10 | first page of this document, it talks about | 12:40:00 |
| 11 | various factors that should be present in order | 12:40:06 |
| 12 | for group discipline of a high order to prevail? | 12:40:09 |
| 13 | Do you see that? | 12:40:14 |
| 14 | A.   No.  Could you re-direct me?  Oh, I got | 12:40:18 |
| 15 | it.  Under 4, "The Positive Meaning of | 12:40:21 |
| 16 | Discipline." | 12:40:25 |
| 17 | Q.   Correct.  And is under 4b, it says, | 12:40:27 |
| 18 | "When the following factors are present, group | 12:40:30 |
| 19 | discipline of a high order will prevail." | 12:40:32 |
| 20 | Do you see that? | 12:40:34 |
| 21 | A.   I see. | 12:40:38 |
| 22 | Q.   If you turn to the next page under 4 and | 12:40:39 |
| 23 | 5, two of the factors that it indicates should be | 12:40:44 |
| 24 | present for group discipline of a high order are, | 12:40:50 |
| 25 | "Free communications upward and downward."  Is | 12:40:54 |

Transcript of Irena Matijevic
Conducted on September 18, 2017                    97

| | | |
|---|---|---|
| 1 | that correct? | 12:41:01 |
| 2 | A.  Yes. | 12:41:01 |
| 3 | Q.  And another factor that should be | 12:41:02 |
| 4 | present is, "Freedom to express opinions and | 12:41:03 |
| 5 | suggestion, with the assurance that they will | 12:41:06 |
| 6 | receive consideration." | 12:41:08 |
| 7 | Is that correct? | 12:41:09 |
| 8 | A.  Yes. | 12:41:09 |
| 9 | Q.  Generally, what policies, if any, does | 12:41:21 |
| 10 | GSA have in terms of progressive discipline? | 12:41:23 |
| 11 | A.  This is it. | 12:41:28 |
| 12 | Q.  So that's referenced in this particular | 12:41:28 |
| 13 | GSA order that's marked as "Exhibit 6"? | 12:41:40 |
| 14 | A.  Yes. | |
| 15 | Q.  If you turn to Page 3 under Number 8, it | 12:41:47 |
| 16 | refers to Non-Disciplinary Letters of Instruction | 12:41:51 |
| 17 | or Counseling. | 12:41:54 |
| 18 | Do you see that? | 12:41:57 |
| 19 | A.  Yes. | 12:41:57 |
| 20 | Q.  And then 9, it references to Warning | 12:41:58 |
| 21 | Notices. | 12:42:00 |
| 22 | And 10, Official Reprimands. | 12:42:02 |
| 23 | 11, Suspensions. | 12:42:04 |
| 24 | And 12, Removal. | 12:42:06 |
| 25 | Would those be the levels of | 12:42:09 |

Transcript of Irena Matijevic
Conducted on September 18, 2017                    98

| | | |
|---|---|---|
| 1 | discipline from lowest to highest? | 12:42:10 |
| 2 | A.  Yes. | 12:42:13 |
| 3 | Q.  And on Page 5, where it refers to | 12:42:23 |
| 4 | "removal," let me know when you're there. | 12:42:31 |
| 5 | A.  I'm there. | 12:42:37 |
| 6 | Q.  It says, "Removal is a drastic penalty | 12:42:38 |
| 7 | that may be imposed only for repeated violations | 12:42:39 |
| 8 | or offenses, or for one or more offenses | 12:42:43 |
| 9 | involving serious misconduct or delinquency." | 12:42:45 |
| 10 | Is that accurate? | 12:42:55 |
| 11 | A.  Yes. | 12:42:55 |
| 12 | Q.  And then it goes on to reference how, | 12:42:58 |
| 13 | "Since removal on charges of misconduct can be | 12:43:01 |
| 14 | expected to make it difficult or even impossible | 12:43:04 |
| 15 | for the employee to continue his Government | |
| 16 | career in another agency, the step should be | 12:43:10 |
| 17 | taken only after careful weighing of the | 12:43:11 |
| 18 | evidence," et cetera. | 12:43:13 |
| 19 | Would you agree that removal on | 12:43:14 |
| 20 | charges of misconduct could make it difficult or | 12:43:16 |
| 21 | even impossible for an employee to continue his | 12:43:18 |
| 22 | government career in another agency? | 12:43:21 |
| 23 | A.  Yes. | 12:43:23 |
| 24 | Q.  And at the bottom of that same page | 12:43:34 |
| 25 | under "General Cautions," it says, "Disciplinary | 12:43:35 |

| | | |
|---|---|---|
| 1 | actions are complex matters that should be | 12:43:38 |
| 2 | undertaken only with the advice and assistance of | 12:43:41 |
| 3 | the appropriate Human Resources office." | 12:43:46 |
| 4 | Is that accurate? | 12:43:47 |
| 5 | A.  Yes. | 12:43:48 |
| 6 | Q.  Next sentence says, "Supervisors should | 12:44:07 |
| 7 | seek human resources advice office at the first | 12:44:10 |
| 8 | sign of conduct problems" -- | 12:44:01 |
| 9 | THE COURT REPORTER:  I'm sorry. | 12:44:01 |
| 10 | You cut out just a little.  Could you start over | 12:44:02 |
| 11 | there? | 12:44:03 |
| 12 | MR. HARRINGTON:  Sure. | |
| 13 | BY MR. HARRINGTON: | |
| 14 | Q.  And next sentence says, "Supervisors | 12:44:07 |
| 15 | should seek human resources advice office at the | 12:44:09 |
| 16 | first sign of conduct problems or poor | 12:44:15 |
| 17 | performance before the problems have become | 12:44:16 |
| 18 | severe." | |
| 19 | Is that accurate? | 12:44:23 |
| 20 | A.  Yes. | 12:44:24 |
| 21 | Q.  And below that under 14 it says, | 12:44:28 |
| 22 | "Supervisor should not store up criticisms but | 12:44:30 |
| 23 | should discuss any perceived problems with | 12:44:32 |
| 24 | employee as soon as such problems arise." | |
| 25 | Is that accurate? | |

Transcript of Irena Matijevic
Conducted on September 18, 2017

1          A.   Yes.

2          Q.   And under 15c, "Inquiry to Determine the

3     Facts," it says, "The Following steps are

4     recommended to guide the supervisor in conducting

5     an inquiry to secure the facts needed to

6     determine what disciplinary action, if any, is

7     warranted."

8                    And it lists three things, one,

9     "Interview the employee who has allegedly

10    committed an offence."

11                    "Interview witnesses and any others

12    who can provide pertinent information."

13                    "Try to reconcile any conflicting

14    statements or other evidence.  Re-interview the

15    parties concerned if appropriate."

16                    First of all, do you agree that

17    those -- those are recommended steps that a

18    supervisor could follow?

19         A.   Yes.  Those are some of the few

20    recommended steps.

21         Q.   They are the only recommended steps

22    listed under 15c.  Correct?

23         A.   Yes.

24         Q.   Okay.  Was Mr. Smith interviewed by Mr.

25    Augustus to determine whether he had committed an

Transcript of Irena Matijevic
Conducted on September 18, 2017                          101

| | | |
|---|---|---|
| 1 | offence? | 13:48:40 |
| 2 | A. No. | |
| 3 | Q. Were you aware that he hadn't | |
| 4 | interviewed Mr. Smith? | |
| 5 | A. Yes. | |
| 6 | Q. We already discussed how Julia Pfohl | |
| 7 | didn't interview anyone when she was a deciding | |
| 8 | official on -- on an action against Mr. Smith. | |
| 9 | Correct? | |
| 10 | A. Correct. | 12:46:36 |
| 11 | Q. Do you know whether Mr. Augustus has | 12:46:36 |
| 12 | interviewed any witnesses or others who could | 12:46:41 |
| 13 | provide pertinent information regarding the | 12:46:43 |
| 14 | actions he was contemplating against Mr. Smith? | 12:46:46 |
| 15 | A. Not that I'm aware of. | 12:46:49 |
| 16 | MR. HARRINGTON: Can we go off the | 12:47:02 |
| 17 | record for a minute? | 12:47:04 |
| 18 | THE VIDEOGRAPHER: Off the record | 12:47:05 |
| 19 | 12:47 p.m. | 12:47:06 |
| 20 | (Recess taken.) | 12:47:13 |
| 21 | THE VIDEOGRAPHER: On the record | 13:48:20 |
| 22 | 1:48 p.m. | 13:48:21 |
| 23 | BY MR. HARRINGTON: | 13:48:26 |
| 24 | Q. Irena, let me ask you to look at | 13:48:26 |
| 25 | Exhibit 6. I think it was sent to GSA as | 13:48:33 |

Transcript of Irena Matijevic
Conducted on September 18, 2017

| | | |
|---|---|---|
| 1 | "Exhibit 6." | 13:48:38 |
| 2 | A.  No. | 13:48:40 |
| 3 | MR. HARRINGTON:  Have we marked -- | 13:48:45 |
| 4 | I was going to say, have we marked Exhibit 6 | 13:48:46 |
| 5 | already? | 13:48:46 |
| 6 | THE COURT REPORTER:  Yes. | 13:48:47 |
| 7 | BY MR. HARRINGTON: | 13:48:48 |
| 8 | Q.  So this will be Exhibit 7 sent to you as | 13:48:48 |
| 9 | "Exhibit 6." | 13:48:51 |
| 10 | A.  Okay.  Thank you.  Let me just mark my | 13:48:57 |
| 11 | stuff.  So we are going to mark this now to be | 13:48:59 |
| 12 | "Exhibit 7." | 13:49:01 |
| 13 | (Deposition Exhibit Number 7 is | |
| 14 | marked.) | |
| 15 | BY MR. HARRINGTON: | 13:49:08 |
| 16 | Q.  And the document is marked as | 13:49:08 |
| 17 | "Exhibit 7."  The memorandum dated April 8th, | 13:49:11 |
| 18 | 2016 from Roman Augustus Subject:  Notice of | 13:49:15 |
| 19 | Proposed Suspension? | 13:49:20 |
| 20 | A.  Yes. | 13:49:21 |
| 21 | Q.  Okay.  And we talked about this somewhat | 13:49:28 |
| 22 | earlier today.  But again, what was your role, if | 13:49:30 |
| 23 | any, in processing or handling this Notice of | 13:49:34 |
| 24 | Proposed Suspension? | 13:49:41 |
| 25 | A.  So provided guidance to Roman give him | 13:49:42 |

Transcript of Irena Matijevic
Conducted on September 18, 2017                        103

| | | |
|---|---|---|
| 1 | instructions as to what the process is. | 13:49:49 |
| 2 | He completed the Douglas Factor | 13:49:54 |
| 3 | Analysis. | 13:49:56 |
| 4 | And once he made a decision, I | 13:49:59 |
| 5 | drafted the Notice of Proposed Suspension. | 13:50:00 |
| 6 | Q.  So what guidance did you provide to | 13:50:09 |
| 7 | Mr. Augustus other than instructions as to the | 13:50:11 |
| 8 | process? | 13:50:13 |
| 9 | A.  This was an unusual case.  And the fact | 13:50:25 |
| 10 | that the previous supervisor had initiated this | 13:50:33 |
| 11 | action or was in the process of working with | 13:50:40 |
| 12 | Region IV Human Resources.  However, it was not | 13:50:42 |
| 13 | finished before the OCF0 reorg.  So when Roman | 13:50:47 |
| 14 | became the new supervisor James Nastasi presented | 13:50:54 |
| 15 | him with the facts, and Roman needed to make a | 13:51:01 |
| 16 | decision.  Because now he was the supervisor. | 13:51:03 |
| 17 | Q.  When you refer to the previous | 13:51:11 |
| 18 | supervisor, you're referring to James Nastasi? | 13:51:12 |
| 19 | A.  Correct. | 13:51:15 |
| 20 | Q.  What action was Nastasi taking prior to | 13:51:18 |
| 21 | being replaced by Mr. Augustus in terms of any | 13:51:22 |
| 22 | actions related to Mr. Smith? | 13:51:24 |
| 23 | A.  So it's my understanding specifically | 13:51:26 |
| 24 | related to this that he had been in contact with | 13:51:34 |
| 25 | Region IV Human Resources.  He had shared the | 13:51:36 |



## Planet **Depos**
We Make It *Happen*™

# **Transcript of Julia Pfohl**

**Date:** September 21, 2017

**Case:** Robert W. Smith -v- Timothy O. Horne, Acting Admin., General Services Admin.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

| | | |
|---|---|---|
| 1 | disclosures under the Whistleblower Protection Act? | 15:20:35 |
| 2 | A.    I did not make a determination on | 15:20:38 |
| 3 | that. | 15:20:47 |
| 4 | Q.    And I don't want you to tell me about | 15:20:49 |
| 5 | any legal advice you may have received, not the | 15:20:54 |
| 6 | substance of any legal advice, but did you seek any | 15:20:57 |
| 7 | legal advice in terms of whether these disclosures | 15:21:00 |
| 8 | were protected activity under the WPA? | 15:21:03 |
| 9 | A.    I don't -- I don't recall for sure. | 15:21:07 |
| 10 | Q.    At the top of page 8, and let me just | 15:21:22 |
| 11 | see where that continues, at the top of page 8, it's | 15:21:26 |
| 12 | really continuing through page 11, there's references | 15:21:34 |
| 13 | there to what Mr. Smith characterizes as the efforts | 15:21:36 |
| 14 | of managers at GSA to stop his disclosures.  What, if | 15:21:42 |
| 15 | anything, did you do to determine the accuracy of | 15:21:50 |
| 16 | what Mr. Smith represented on those pages beginning | 15:21:54 |
| 17 | on page 8? | 15:21:57 |
| 18 | A.    I didn't do anything beyond what was | 15:21:59 |
| 19 | provided in this document. | 15:22:03 |
| 20 | Q.    Well, other than reading this | 15:22:05 |
| 21 | document, how did you make any kind of determination | 15:22:15 |
| 22 | as to, again, first whether his disclosures were | 15:22:17 |
| 23 | protected and second, whether there was any | 15:22:21 |
| 24 | retaliatory motive on the part of any GSA manager | 15:22:23 |
| 25 | because of those disclosures? | 15:22:27 |

| 1 | A. When I reviewed the document I was | 15:22:28 |
| 2 | really very focused on the specific elements of the | 15:22:34 |
| 3 | notice for removal and the specifications in there, | 15:22:39 |
| 4 | and so I didn't -- I didn't focus my efforts on these | 15:22:47 |
| 5 | other claims that were included in the response. | 15:22:56 |
| 6 | Q. How did you make any determination as | 15:23:04 |
| 7 | to whether the specifications included in the Notice | 15:23:05 |
| 8 | of Proposed Removal were motivated in any way by | 15:23:10 |
| 9 | retaliatory animus on the part of any of the GSA | 15:23:13 |
| 10 | managers? | 15:23:19 |
| 11 | A. Can you -- can you ask -- rephrase | 15:23:21 |
| 12 | that question? | 15:23:24 |
| 13 | Q. How did you determine whether any of | 15:23:25 |
| 14 | the specifications in the Notice of Proposed Removal | 15:23:27 |
| 15 | were motivated even in part by retaliatory animus on | 15:23:30 |
| 16 | the part of Mr. Augustus or any previous managers? | 15:23:37 |
| 17 | A. I did not. I did not further | 15:23:41 |
| 18 | investigate that. | 15:23:52 |
| 19 | Q. Okay. Let's turn to page 11 and I | 15:23:53 |
| 20 | want to review some of Mr. Smith's specific responses | 15:24:06 |
| 21 | to the charges and specifications. | 15:24:09 |
| 22 | Specification 1 related to an e-mail | 15:24:14 |
| 23 | that Mr. Smith sent on April 25th, 2016, regarding -- | 15:24:17 |
| 24 | well, an e-mail he sent on April 25th, 2016, that Mr. | 15:24:25 |
| 25 | Augustus alleged was disrespectful conduct towards a | 15:24:32 |

Transcript of Julia Pfohl
Conducted on September 21, 2017          155

| | | |
|---|---|---|
| 1 | supervisor. | 15:24:35 |
| 2 | Did you review Mr. Smith's response in | 15:24:36 |
| 3 | terms of the context of that e-mail and his position | 15:24:38 |
| 4 | in terms of why it was not disrespectful? | 15:24:45 |
| 5 | A.    I -- I do not recall if I reviewed the | 15:24:49 |
| 6 | entire contents of that e-mail.  If it was included | 15:24:57 |
| 7 | in the documents I would have reviewed it, but I | 15:24:59 |
| 8 | didn't feel his response was -- justified his | 15:25:13 |
| 9 | behavior. | 15:25:22 |
| 10 | Q.    Okay.  So at the top of page 12 | 15:25:25 |
| 11 | Mr. Smith indicated that his April 25th, 2016 e-mail, | 15:25:29 |
| 12 | which was in response to an e-mail from Mr. | 15:25:36 |
| 13 | Augustus -- well, he describes his response to Mr. | 15:25:40 |
| 14 | Augustus' e-mail as -- let's talk about Mr. -- I'm | 15:25:48 |
| 15 | sorry.  Let's talk about Mr. Augustus' e-mail that | 15:25:53 |
| 16 | Mr. Smith was responding to.  Mr. Smith said, "Mr. | 15:25:56 |
| 17 | Augustus used language that indicates that he assumed | 15:26:00 |
| 18 | that Mr. Smith had not done what he told Mr. Smith to | 15:26:02 |
| 19 | do rather than assuming Mr. Smith had done what Mr. | 15:26:05 |
| 20 | Augustus had asked, and that some sort of error had | 15:26:10 |
| 21 | occurred.  This presumptive negative phrasing paired | 15:26:12 |
| 22 | with Mr. Augustus changing rules for Mr. Smith's | 15:26:16 |
| 23 | work, upset Mr. Smith and that is why he wrote that | 15:26:19 |
| 24 | Mr. Augustus should directly call him a liar or | 15:26:22 |
| 25 | confront him with violations of Mr. Augustus' rules." | 15:26:26 |

Case 1:22-cv-00146-ELR-CMS   Document 1   Filed 01/12/22   Page 92 of 108

| | | |
|---|---|---|
| 1 | So tell me how you interpreted that | 15:26:30 |
| 2 | argument on the part of Mr. Smith and why, if you | 15:26:35 |
| 3 | didn't accept it, why you didn't accept it? | 15:26:39 |
| 4 | A.    I -- in reading through that I felt | 15:26:44 |
| 5 | that Mr. Smith was merely reaching for reasons to | 15:26:56 |
| 6 | justify the disrespectful nature of his e-mail. | 15:27:02 |
| 7 | Q.    So specifically what was characterized | 15:27:17 |
| 8 | as disrespectful language on the part of Mr. Smith | 15:27:21 |
| 9 | was, when he wrote to Mr. Augustus and he said, "Call | 15:27:23 |
| 10 | me a liar or just confront me with any mild | 15:27:26 |
| 11 | infraction of your rules, I can handle it."  Is that | 15:27:29 |
| 12 | the only language in that e-mail that was deemed | 15:27:32 |
| 13 | disrespectful? | 15:27:35 |
| 14 | A.    Yes. | 15:27:36 |
| 15 | Q.    So it's your determination that the | 15:27:37 |
| 16 | context in which Mr. Augustus -- I'm sorry, in which | 15:27:42 |
| 17 | Mr. Smith made that comment was not -- well, so the | 15:27:46 |
| 18 | context of that response, as I just described it to | 15:27:57 |
| 19 | you, was not persuasive to you, correct? | 15:28:00 |
| 20 | A.    Correct. | 15:28:03 |
| 21 | Q.    And you understood that with regard to | 15:28:04 |
| 22 | this specification as with regard to all of these | 15:28:08 |
| 23 | specifications, GSA had the burden of proof, correct? | 15:28:11 |
| 24 | A.    Yes. | 15:28:15 |
| 25 | Q.    In the next paragraph Mr. Smith | 15:28:15 |

| | |
|---|---|
| 1 | pointed out that Mr. Augustus did not include this | 15:28:23 |
| 2 | incident in the Record of Infraction even though the | 15:28:26 |
| 3 | incident had occurred prior to that Record of | 15:28:29 |
| 4 | Infraction and it wasn't addressed in his Performance | 15:28:31 |
| 5 | Improvement Plan which was issued after the e-mail. | 15:28:38 |
| 6 |                     Did you attach any significance to | 15:28:41 |
| 7 | that? | 15:28:44 |
| 8 |           A.    No. | 15:28:44 |
| 9 |           Q.    With regards to Specification 2, | 15:28:45 |
| 10 | Mr. Smith provided you a lengthy explanation of the | 15:28:56 |
| 11 | context of the e-mail that they characterized as | 15:28:59 |
| 12 | disrespect.  Tell me why you were not persuaded by | 15:29:04 |
| 13 | Mr. Smith's explanation of the context of that | 15:29:08 |
| 14 | e-mail, and why it should not be considered | 15:29:11 |
| 15 | disrespectful given the context? | 15:29:15 |
| 16 |           A.    Give me a minute to read through this, | 15:29:17 |
| 17 | please. | 15:29:26 |
| 18 |                     Okay.  Can you -- can you ask me the | 15:29:53 |
| 19 | question again?  I'm sorry, I just needed to refresh | 15:29:54 |
| 20 | my memory on this -- on this specification. | 15:29:56 |
| 21 |           Q.    Why were you not persuaded by Mr. | 15:29:58 |
| 22 | Smith's explanation about the context of that e-mail | 15:30:06 |
| 23 | and why it should not in context be considered | 15:30:09 |
| 24 | disrespectful, especially given the fact that GSA had | 15:30:13 |
| 25 | the burden of proof? | 15:30:17 |

Transcript of Julia Pfohl
Conducted on September 21, 2017

158

| 1 | A. I don't believe anything that -- I | 15:30:18 |
| 2 | don't believe that Mr. Smith provided any evidence | 15:30:21 |
| 3 | that disclaimed that these were not disrespectful | 15:30:27 |
| 4 | comments. He acknowledged making the statements, the | 15:30:32 |
| 5 | statements are clearly disrespectful. | 15:30:39 |
| 6 | Q. So you're saying those comments are | 15:30:48 |
| 7 | clearly disrespectful and no one could come to any | 15:30:51 |
| 8 | other conclusion regardless of the context in which | 15:30:53 |
| 9 | they were made? | 15:30:56 |
| 10 | A. As I read them I find them to be | 15:30:59 |
| 11 | disrespectful, yes. | 15:31:02 |
| 12 | Q. And didn't Mr. Smith specifically | 15:31:03 |
| 13 | reference the fact that he considered that Mr. | 15:31:07 |
| 14 | Augustus was again attempting to impede his work in | 15:31:12 |
| 15 | contravention of the independent and scope of | 15:31:16 |
| 16 | responsibility given to him in his position | 15:31:20 |
| 17 | description that resolved a prior EEO complaint? | 15:31:22 |
| 18 | A. I believe that was what Mr. Smith | 15:31:26 |
| 19 | indicated. I don't agree, but I do believe that's | 15:31:29 |
| 20 | what he indicated. | 15:31:35 |
| 21 | Q. And, again, in the same context, did | 15:31:35 |
| 22 | you consider whether Mr. Smith was reacting to what | 15:31:48 |
| 23 | he considered efforts on the part of Mr. Augustus, | 15:31:54 |
| 24 | not only to contravene his position description, but | 15:31:56 |
| 25 | to impede his ability to make disclosures protected | 15:32:00 |

| | | |
|---|---|---|
| 1 | by the WPA? | 15:32:03 |
| 2 | A.     Can you ask that question again, | 15:32:05 |
| 3 | please? | |
| 4 | MR. HARRINGTON:  Can you read it back, | 15:32:36 |
| 5 | please? | |
| 6 | (The previous question was read back | |
| 7 | by the reporter.) | 15:32:38 |
| 8 | A.     I would say no to both of those. | 15:32:38 |
| 9 | Q.     (By Mr. Harrington)  No, you did not | 15:32:43 |
| 10 | consider either? | 15:32:48 |
| 11 | A.     I didn't consider his responses to | 15:32:48 |
| 12 | indicate that -- or to be persuasive that's what was | 15:32:52 |
| 13 | happening. | 15:32:57 |
| 14 | Q.     Well, you never made any determination | 15:32:57 |
| 15 | as to whether his -- he made protected disclosures | 15:33:03 |
| 16 | under the WPA or whether there was evidence of animus | 15:33:08 |
| 17 | resulting from the disclosures? | 15:33:12 |
| 18 | A.     No. | 15:33:12 |
| 19 | Q.     And in Specification 3, which | 15:33:14 |
| 20 | references another -- well, references statements | 15:33:25 |
| 21 | Mr. Smith made in his official response to the GSA | 15:33:28 |
| 22 | Form 225 Record of Infraction. | 15:33:33 |
| 23 | First of all, do you know whether | 15:33:38 |
| 24 | that's a -- I'm on the top of page 14 here.  Do you | 15:33:40 |
| 25 | know whether that's a reference to Mr. Smith's | 15:33:44 |

| 1 | grievance of the Record 225 Form of Infraction? | 15:33:48 |
| 2 | A.    I don't know for sure if it is.  I | 15:33:52 |
| 3 | believe it is.  I'd have to go back and read through | 15:33:59 |
| 4 | the response. | 15:34:02 |
| 5 | Q.    Okay.  Is it appropriate and permitted | 15:34:02 |
| 6 | for GSA to discipline somebody for statements they | 15:34:18 |
| 7 | make in response in an official response to a Record | 15:34:22 |
| 8 | of Infraction? | 15:34:26 |
| 9 | A.    I don't know. | 15:34:26 |
| 10 | Q.    Again, in terms of the information | 15:34:26 |
| 11 | Mr. Smith provided to you to give you the context of | 15:34:34 |
| 12 | that response, is it accurate you were not persuaded | 15:34:38 |
| 13 | by it? | 15:34:43 |
| 14 | A.    I was not persuaded by it. | 15:34:44 |
| 15 | Q.    And in his response he referenced | 15:34:46 |
| 16 | previous communications on his part that disclosed a | 15:34:54 |
| 17 | gross waste of funds and gross mismanagement by GSA | 15:34:56 |
| 18 | as part of the context for his response.  Did you | 15:35:02 |
| 19 | make any determination whether that was accurate? | 15:35:06 |
| 20 | A.    I read through -- I read through the | 15:35:08 |
| 21 | FY 2015 Performance Diagnostic and I don't agree that | 15:35:15 |
| 22 | they are a disclosure per se. | 15:35:19 |
| 23 | Q.    Okay.  Specification 4 that begins on | 15:35:24 |
| 24 | page 14, did you carefully review Mr. Smith's | 15:35:31 |
| 25 | response with regard to that specification? | 15:35:39 |

Transcript of Julia Pfohl
Conducted on September 21, 2017                161

| | | |
|---|---|---|
| 1 | A.      I'm sure I did.  Yes. | 15:35:41 |
| 2 | Q.      What merit, if any, did you find in | 15:35:55 |
| 3 | Mr. Smith's argument that what's at issue here was | 15:35:57 |
| 4 | another attempt by Mr. Augustus -- well, that the | 15:36:02 |
| 5 | context of this discussion was Mr. Smith's | 15:36:07 |
| 6 | Performance Improvement Plan and the task that Mr. | 15:36:12 |
| 7 | Augustus refers to is not part of the Performance | 15:36:15 |
| 8 | Improvement Plan, was that context important to you? | 15:36:18 |
| 9 | A.      I have to read through this.  I'm not | 15:36:29 |
| 10 | sure I understand your question. | 15:36:31 |
| 11 | So I think in answer to your question, | 15:36:58 |
| 12 | I did not find the response sufficient to address the | 15:36:59 |
| 13 | specification. | 15:37:06 |
| 14 | Q.      Specification 5 in terms of response | 15:37:14 |
| 15 | by Mr. Smith there, did he point out that again this | 15:37:20 |
| 16 | refers to a meeting related to -- pardon me here, let | 15:37:25 |
| 17 | me do my own reading through. | 15:37:36 |
| 18 | Let me point you to his -- the | 15:37:40 |
| 19 | concluding statements Mr. Smith made at the top of | 15:37:46 |
| 20 | page 16, that these, and Mr. Smith's other comments | 15:37:49 |
| 21 | in a letter that's being found objectionable here, | 15:37:53 |
| 22 | related back to his concerns about wasted taxpayer | 15:37:58 |
| 23 | funds and mismanagement and retaliatory acts on the | 15:38:02 |
| 24 | part of GSA because of his raising of those concerns. | 15:38:07 |
| 25 | A.      I'm sorry, I don't think I heard a | 15:38:22 |

| | | |
|---|---|---|
| 1 | question there.  Can you repeat the question? | 15:38:24 |
| 2 | Q.      There was a question in there and | 15:38:29 |
| 3 | hopefully the reporter can read it back to you. | 15:38:34 |
| 4 | (The previous question was read back | |
| 5 | by the reporter.) | 15:39:08 |
| 6 | Q.      (By Mr. Harrington) You're right, it | 15:39:08 |
| 7 | sounds like there wasn't a question in there.  But | 15:39:10 |
| 8 | did you realize Mr. Smith was arguing that the letter | 15:39:13 |
| 9 | for which he's being -- the letter that's the basis | 15:39:16 |
| 10 | of Specification 5 was, in fact, another protected | 15:39:20 |
| 11 | disclosure under the WPA and as Mr. Smith argued | 15:39:23 |
| 12 | here, to take action against him because of that | 15:39:27 |
| 13 | letter is a per se violation of the WPA? | 15:39:31 |
| 14 | A.      I see that is a claim that he makes, | 15:39:34 |
| 15 | but I don't agree.  I don't agree with that position. | 15:39:38 |
| 16 | Q.      So are Mr. Smith's statements in the | 15:39:47 |
| 17 | letter to Mr. Augustus in which he criticizes Mr. | 15:39:52 |
| 18 | Augustus for limiting the region's ability to | 15:39:54 |
| 19 | recapture $34 million in funding, operation and | 15:39:57 |
| 20 | performance inefficiencies, is that a protected | 15:40:00 |
| 21 | disclosure or communication under the WPA? | 15:40:06 |
| 22 | A.      I don't know the answer to that | 15:40:08 |
| 23 | question. | 15:40:11 |
| 24 | Q.      If you don't know the answer to that | 15:40:11 |
| 25 | question, how could you have determined whether there | 15:40:18 |

| 1 | was merit to Mr. Smith's argument? | 15:40:21 |
| 2 | A.     I don't believe there is merit to | 15:40:23 |
| 3 | Mr. Smith's argument because there wasn't $34 million | 15:40:25 |
| 4 | to recapture per his comment. | 15:40:28 |
| 5 | Q.     How do you know that? | 15:40:32 |
| 6 | A.     He makes -- in reviewing the | 15:40:37 |
| 7 | Performance Diagnostic, he makes assumptions in there | 15:40:44 |
| 8 | that aren't necessarily assumptions that would lead | 15:40:47 |
| 9 | to the recovery of that. | 15:40:52 |
| 10 | Q.     So you're disagreeing with the | 15:40:58 |
| 11 | substance of what Mr. Smith is concerned about? | 15:41:01 |
| 12 | A.     I'm not disagreeing that he shouldn't | 15:41:07 |
| 13 | be this concerned, I'm disagreeing that represents an | 15:41:08 |
| 14 | amount that could be fully recaptured. | 15:41:12 |
| 15 | Q.     So does that mean his concerns, his | 15:41:14 |
| 16 | raising of the concerns, are not protected | 15:41:22 |
| 17 | communication under the WPA because you disagree with | 15:41:25 |
| 18 | whether that money can be recaptured? | 15:41:28 |
| 19 | A.     I don't know.  I'm not an expert as we | 15:41:30 |
| 20 | clearly demonstrated earlier on WPA. | 15:41:35 |
| 21 | Q.     And I know I asked you this earlier, | 15:41:41 |
| 22 | but did you seek any expert guidance when you were | 15:41:43 |
| 23 | acting as the Deciding Official? | 15:41:48 |
| 24 | A.     No. | 15:41:49 |
| 25 | Q.     Okay.  So Charge 2 relates to the | 15:41:49 |

| | | |
|---|---|---|
| 1 | absence without leave issue.  Mr. Smith provided a | 15:41:55 |
| 2 | lengthy explanation there, the gist of which is that | 15:42:01 |
| 3 | he worked on each of the days listed above and that | 15:42:05 |
| 4 | Mr. Augustus was aware that he was working.  And he | 15:42:08 |
| 5 | explains to you in length why the work that he was | 15:42:15 |
| 6 | doing would not necessarily be reflected in MyView or | 15:42:18 |
| 7 | Google Activity or other system type records. | 15:42:22 |
| 8 | What did you do, if anything, to | 15:42:34 |
| 9 | determine whether Mr. Smith was, in fact, working and | 15:42:35 |
| 10 | working in ways that wouldn't be reflected in MyView | 15:42:39 |
| 11 | or Google and that Mr. Augustus knew that he was | 15:42:42 |
| 12 | working? | 15:42:45 |
| 13 | A.    Well, I think it -- I felt it was very | 15:42:47 |
| 14 | clear that if Mr. Augustus did not know that he was | 15:42:51 |
| 15 | working, he couldn't identify any specific work | 15:42:53 |
| 16 | products that were presented on those days in | 15:42:58 |
| 17 | question. | 15:43:01 |
| 18 | As for the statements about Mr. Smith | 15:43:04 |
| 19 | doing work outside of the systems, I do understand | 15:43:08 |
| 20 | that that is possible in limited capacity, but, | 15:43:11 |
| 21 | again, my expectation of a Senior Financial Analyst | 15:43:15 |
| 22 | is that they're going to be working on data that is | 15:43:18 |
| 23 | only available within our firewall and for -- to go | 15:43:21 |
| 24 | for extended periods of time without accessing any of | 15:43:25 |
| 25 | that data seems unrealistic in terms of him being | 15:43:28 |

| | | |
|---|---|---|
| 1 | able to successfully work on his assigned tasks. | 15:43:35 |
| 2 | Q. Did you do anything to determine | 15:43:46 |
| 3 | whether Mr. Smith had actually performed the work | 15:43:51 |
| 4 | that he said that he had performed? | 15:43:55 |
| 5 | A. No, I didn't -- I didn't investigate | 15:43:57 |
| 6 | deeper into those claims if that's what you're | 15:44:04 |
| 7 | asking. | 15:44:06 |
| 8 | Q. Well, didn't Mr. Smith as reflected | 15:44:07 |
| 9 | here on page 17, provide you with a number of weekly | 15:44:11 |
| 10 | task sheets, provided Mr. Augustus with a number of | 15:44:15 |
| 11 | weekly task sheets, and those task sheets were | 15:44:18 |
| 12 | attached as exhibits to this response that laid out | 15:44:23 |
| 13 | in detail the work that he was performing during the | 15:44:27 |
| 14 | period when it was claimed he was doing no work? | 15:44:30 |
| 15 | A. The task sheets were pretty high | 15:44:34 |
| 16 | level, they weren't terribly specific on those weeks. | 15:44:37 |
| 17 | They didn't specify a lot of productive work as I | 15:44:43 |
| 18 | recall. I did review them as part of my examination | 15:44:54 |
| 19 | of this information. | 15:44:58 |
| 20 | Q. So if I understand you correctly, | 15:44:59 |
| 21 | you're saying you consider those weekly task sheets | 15:45:03 |
| 22 | to lack specificity sufficient to convince you that | 15:45:08 |
| 23 | Mr. Smith was doing the work that he said that he was | 15:45:11 |
| 24 | doing? | 15:45:14 |
| 25 | A. For those particular days or for the | 15:45:14 |

| | | |
|---|---|---|
| 1 | weeks that those particular days fall within. | 15:45:16 |
| 2 | Q.   Did you do any kind of follow-up to | 15:45:23 |
| 3 | see if those task sheets were accurate or not? | 15:45:25 |
| 4 | A.   No. | 15:45:27 |
| 5 | Q.   At the bottom of page 17 Mr. Smith | 15:45:28 |
| 6 | pointed out that Mr. Augustus didn't take any action | 15:45:35 |
| 7 | during this, really a two month period from March | 15:45:40 |
| 8 | 17th, 2016, through May 17th, 2016, in terms of | 15:45:43 |
| 9 | whether Mr. Smith was performing work or not. | 15:45:48 |
| 10 | Did you make any inquiries to | 15:45:52 |
| 11 | determine why Mr. Augustus never put his hand up | 15:45:54 |
| 12 | during that two month period to figure out why | 15:45:58 |
| 13 | Mr. Smith, as Mr. Augustus later claimed, wasn't | 15:46:03 |
| 14 | performing any work? | 15:46:06 |
| 15 | A.   No. | 15:46:08 |
| 16 | Q.   At the top of page 18, did you | 15:46:09 |
| 17 | consider the information that Mr. Smith presented to | 15:46:22 |
| 18 | you about the large number of hours of annual leave | 15:46:26 |
| 19 | and sick leave he had, over 300 hours of annual leave | 15:46:31 |
| 20 | and 268 hours of sick leave that were available to | 15:46:35 |
| 21 | him in considering -- well, as Mr. Smith put it, he | 15:46:39 |
| 22 | had no reason to be AWOL or risk being charged with | 15:46:43 |
| 23 | AWOL given that extensive leave that was available to | 15:46:48 |
| 24 | him.  Did you consider that? | 15:46:52 |
| 25 | A.   No. | 15:46:54 |

Transcript of Julia Pfohl
Conducted on September 21, 2017                167

```
 1            Q.    Why not?                              15:46:56
 2            A.    I believe -- I mean I -- I considered 15:47:01
 3      that he made that claim, but it -- it doesn't     15:47:03
 4      override the other facts that were presented.     15:47:08
 5            Q.    So you were giving GSA and Mr.         15:47:17
 6      Augustus the benefit of the doubt on each and every 15:47:22
 7      one of these specifications, weren't you?         15:47:24
 8            A.    No, I don't believe I did.            15:47:26
 9            Q.    And on each and every one of these    15:47:30
10      specifications GSA had the burden of proof, correct? 15:47:36
11            A.    Yes.                                  15:47:38
12            Q.    Okay.  In regards to Charge 3, the    15:47:38
13      allegation here is that Mr. Smith failed to forward 15:47:56
14      an update to Mr. Augustus on his progress in      15:47:58
15      researching a particular issue and failed to      15:48:01
16      communicate a minimum one day in advance that he  15:48:04
17      required additional time.                         15:48:08
18                  What was deficient about Mr. Smith's  15:48:11
19      explanation with regard to that charge?           15:48:15
20            A.    I would have to go back and read      15:48:20
21      through it.  Give me a moment.                    15:48:22
22                  Okay.  I'm sorry, can you ask the     15:49:43
23      question again or repeat the question for me?     15:49:44
24            Q.    What was unpersuasive about           15:49:50
25      Mr. Smith's response regarding that charge?       15:49:52
```

| 1  | A.      He doesn't address the specific period | 15:49:55 |
| 2  | of time.  He, in my opinion, he is merely providing | 15:50:00 |
| 3  | excuses for why he didn't have the information or why | 15:50:07 |
| 4  | he didn't provide it or why he didn't notify his | 15:50:10 |
| 5  | supervisor of a delay. | 15:50:19 |
| 6  | Q.      Okay.  So is it your opinion that this | 15:50:21 |
| 7  | specification regarding failure to update Mr. | 15:50:31 |
| 8  | Augustus, assuming this even happened, a failure to | 15:50:36 |
| 9  | update him on progress and researching a particular | 15:50:38 |
| 10 | thing and failing to communicate a minimum of one day | 15:50:41 |
| 11 | in advance that he required additional time, somehow | 15:50:46 |
| 12 | should support removing a 27-year employee even if | 15:50:50 |
| 13 | true? | 15:50:53 |
| 14 | A.      Standing on its own as one individual | 15:50:55 |
| 15 | item I would say no, but in the -- within the | 15:51:00 |
| 16 | population of the other charges it was -- it was part | 15:51:04 |
| 17 | of the consideration. | 15:51:13 |
| 18 | Q.      How much weight did you give to this | 15:51:17 |
| 19 | charge as part of the consideration? | 15:51:19 |
| 20 | A.      I don't know that I can say that I | 15:51:22 |
| 21 | went through an assigned weight to each one of them. | 15:51:28 |
| 22 | Q.      Okay.  On page 19, the next | 15:51:32 |
| 23 | specification, Specification 2, refers to Mr. Smith | 15:51:37 |
| 24 | performing work on the weekend outside of his work | 15:51:40 |
| 25 | duty hours because he sent an e-mail on a Sunday. | 15:51:43 |

| | | |
|---|---|---|
| 1 | And Mr. Smith explained that he had actually | 15:51:49 |
| 2 | performed the work during his work duty hours with | 15:51:52 |
| 3 | the acceptance -- with the exception of one sentence | 15:51:56 |
| 4 | that he needed to complete while he awaited data, and | 15:52:00 |
| 5 | because he was sick he took a few moments to complete | 15:52:05 |
| 6 | the e-mail on the weekend and to push send on a | 15:52:09 |
| 7 | Sunday. | 15:52:13 |
| 8 | Do you think -- well, first of all, | 15:52:14 |
| 9 | did you accept that explanation as credible? | 15:52:17 |
| 10 | A. I don't have any basis to not accept | 15:52:20 |
| 11 | it as credible. I didn't investigate it further. | 15:52:30 |
| 12 | Q. Okay. So assuming you accepted it as | 15:52:35 |
| 13 | credible, how does the fact Mr. Smith took a few | 15:52:41 |
| 14 | moments to complete an e-mail on a Sunday and hit | 15:52:46 |
| 15 | send justify the removal of a 27-year federal | 15:52:49 |
| 16 | employee? | 15:52:52 |
| 17 | A. Well, it's another example of his | 15:52:54 |
| 18 | failure to follow supervisory instruction, which was | 15:52:57 |
| 19 | as demonstrated here as a habit. | 15:53:01 |
| 20 | Q. All right. So the next specification | 15:53:11 |
| 21 | at the bottom of page 19, it relates to whether | 15:53:13 |
| 22 | Mr. Smith did or did not provide certain PIP related | 15:53:27 |
| 23 | task sheets by a particular date. And Mr. Smith's | 15:53:32 |
| 24 | response indicated that he had previously sent the | 15:53:38 |
| 25 | information to Mr. Augustus. | 15:53:41 |



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Robert W. Smith, a/k/a
Cary R.,[1]
Complainant,

v.

Katy Kale,
Acting Administrator,
General Services Administration,
Agency.

Request No. 2021004015

Appeal No. 2021001115

Hearing No. 410-2018-00003X

Agency No. GSA-13-R4-B-0114

DECISION ON REQUEST FOR RECONSIDERATION

Complainant requested that the Equal Employment Opportunity Commission (EEOC or Commission) reconsider its decision in Cary R. v. General Services Administration, EEOC Appeal No. 2021001115 (June 8, 2021). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision issued pursuant to 29 C.F.R. § 1614.405(a), where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. See 29 C.F.R. § 1614.405(c).

Complainant filed a formal EEO complaint alleging that the Agency discriminated against him based on disability when Complainant was not selected for the position of Chief Financial Officer (CFO), GS-0501-15, under announcement number 131004FMMP, GS-0501V-15.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

2                                                    2021004015

Complainant requested a hearing before an EEOC Administrative Judge (AJ).  The AJ issued a decision without a hearing finding no discrimination.  The Agency issued its final order implementing the AJ's decision.  Complainant appealed, and the Commission's prior decision affirmed the Agency's final order.

In his request, Complainant provides no evidence to warrant granting his request.  The Commission emphasizes that a request for reconsideration is not a second appeal to the Commission.  Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110) (Aug. 5, 2015), at 9-18; see, e.g., Lopez v. Dep't of Agric., EEOC Request No. 0520070736 (Aug. 20, 2007).  Rather, a reconsideration request is an opportunity to demonstrate that the appellate decision involved a clearly erroneous interpretation of material fact or law, or will have a substantial impact on the policies, practices, or operations of the Agency. Complainant has not done so here.

After reviewing the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(c), and it is the decision of the Commission to deny the request.  The decision in EEOC Appeal No. 2021001115 remains the Commission's decision.  There is no further right of administrative appeal on the decision of the Commission on this request.

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0610)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision.  You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision.  If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title.  Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs.  Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests.

3                                    2021004015

Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).


FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations


October 13, 2021
Date